**<u>EXHIBIT A</u>**

## IN THE COURT OF COMMON PLEAS
## SUMMIT COUNTY, OHIO

ADVANTUS, CORP.,
12276 San Jose Blvd.
Building 618
Jacksonville, FL 32223

    -and-

FAIRFIELD PROCESSING CORP.,
88 Rosehill Ave.
Danbury, CT 06810

    -and-

GWEN STUDIOS, LLC,
1377 Broadcloth St., Suite 202
Fort Mill, SC 29715

    -and-

LOW TECH TOY CLUB LLC,
510 Meadowmont Village Cir Ste 311
Chapel Hill, NC 27517

    -and-

ORMO ITHALAT IHRACAT A.S.,
Merkez Mahallesi, Bağlar Cad. No:14/B
34406 Ofispark - Kağıthane
Istanbul, Turkey

    -and-

SPRINGS CREATIVE PRODUCTS
GROUP, LLC.,
300 Chatham Avenue, Suite 100
Rock Hill, SC 29730

Plaintiffs,

v.

|  |
|---|
| Case No. 25- |
| **COMPLAINT** |

1

MICHAEL PRENDERGAST,
c/o Alvarez & Marsal
600 Madison Ave.
New York, NY 10022

     -and-

JEFFREY DWYER
c/o Alvarez & Marsal
540 West Madison St., Suite 1800
Chicago, IL 60661

     -and-

ROBERT WILL
c/o SVP Worldwide
300 2nd Ave S., Suite 300
Nashville, TN  37201

     -and-

CHRISTOPHER DITULLIO
58 Jefferson Dr.
Hudson, OH 44236

     -and-

HEATHER HOLODY
1066 N. Revere Road
Akron, OH 44333

     -and-

MICHAEL KENNEDY
c/o JOANN Inc.
5381 Darrow Road
Hudson, OH 44236

     -and-

MELISSA BOWERS,
229 Hunter Ave
Munroe Falls, OH 44262

Defendants.

Plaintiffs Advantus, Corp., Fairfield Processing Corp., Gwen Studios, LLC, Low Tech Toy Club LLC, Ormo Ithalat Ihracat A.S., and Springs Creative Products Group, LLC (the "<u>Plaintiffs</u>"), by and through their undersigned counsel, hereby allege against the above-named Defendants, on personal knowledge as to all matters regarding themselves and on information and belief as to all other matters, as follows:

## <u>INTRODUCTION</u>

1.      This case arises from misrepresentations and omissions made by certain officers and employees of JOANN Inc.[1] ("<u>JOANN</u>" or the "<u>Company</u>"), the leading national fabric and crafts retailer, following JOANN's emergence from a Chapter 11 bankruptcy that JOANN commenced on March 15, 2024 (the "<u>2024 Bankruptcy</u>").

2.      JOANN emerged from the 2024 Bankruptcy as a private company and with a prepackaged reorganization plan, effective April 30, 2024, that eliminated $505 million in debt, provided the Company with $132 million of new capital, and left 96% of the Company's stores "four-wall" cash flow positive (the "<u>2024 Restructuring Plan</u>"). Following the 2024 Bankruptcy, the Company projected a 'rosy' financial condition, with projected adjusted EBITDA of (A) $152 million in 2025 and (B) $201 million in 2026, able to sustain JOANN's significant debt burden.

3.      However, JOANN's financial condition became untenable shortly after it emerged from its 2024 Bankruptcy. But in spite of JOANN's rapid and unexpected decline, the Defendants chose to misrepresent and/or conceal JOANN's financial struggles to the Plaintiffs. Instead,

---

[1]     The term "JOANN" as used in this Complaint shall mean the debtors in the chapter 11 cases: JOANN Inc.; Needle Holdings LLC; Jo-Ann Stores, LLC; Creative Tech Solutions LLC; Creativebug, LLC; WeaveUp, Inc.; JAS Aviation, LLC; joann.com, LLC; JOANN Ditto Holdings Inc.; Dittopatterns LLC; JOANN Holdings 1, LLC; JOANN Holdings 2, LLC; and Jo-Ann Stores Support Center, Inc. The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

Defendants touted JOANN's financial well-being and JOANN's ability to pay Plaintiffs for goods that JOANN ordered on credit.

4.      JOANN's business relationships with Plaintiffs and JOANN's other vendors were critical for JOANN's continued survival and prosperity. Those relationships allowed the Company to obtain the goods essential to its business operations on favorable credit terms, essentially off-loading substantial risk to the Plaintiffs and the rest of the vendor community. In fact, during its 2024 Bankruptcy, JOANN sought and obtained permission from the bankruptcy court to pay outstanding and upcoming amounts owed to its vendors, including Plaintiffs, recognizing that "the services provided by Trade Creditors are necessary for the continued, uninterrupted operation of [JOANN's] businesses. [JOANN] anticipate[s] that failure to pay the Trade Claims as they become due is likely to result in many Trade Creditors refusing to provide essential goods and services." JOANN further recognized that "[n]onperformance by numerous Trade Creditors could materially disrupt [JOANN's] business operations and jeopardize the continued viability of the [] business."[2]

5.      However, despite recognizing that the Plaintiffs and the rest of the vendor community were vital to the Company's business, the Defendants, acting as officers and/or employees for JOANN, took advantage of the Company's important and long-standing relationships with Plaintiffs by making false and misleading representations concerning JOANN's ability to pay for the purpose of inducing Plaintiffs to ship goods to JOANN on credit.

6.      Beginning about a month before JOANN emerged from the 2024 Bankruptcy through January 15, 2025, Defendants made (or caused to be made) misrepresentations to each Plaintiff that the Company was in the best financial shape it had been in for over 10 years and

---

[2]    *See In re JOANN Inc.*, Case No. 24-10418 (Bankr. D. Del.) (the "2024 Chapter 11 Case"), Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business and (II) Granting Related Relief, ¶ 22 ("Trade Vendors' Motion"), Docket No. 2.

assured each Plaintiff that it would be paid in full for goods they shipped to JOANN on credit. As described below, Defendants' representations and assurances were false and made for the purpose of causing each Plaintiff to believe it could safely provide its goods to JOANN on credit. In reliance on those representations, Plaintiffs shipped goods to JOANN on credit and have suffered substantial losses.

7.     Indeed, JOANN later admitted that it (acting through its officers and employees) made financial assurances to its vendors while implementing its 2024 Restructuring Plan. Defendant Prendergast, JOANN's Interim Chief Executive Officer declared that JOANN "took steps to provide sufficient financial assurances to its vendors to enable … flow of product to JOANN's stores," and "provide[d] adequate financial reassurance to vendors and receiv[ed] corresponding commitments to … supply terms from vendors."[3] The "financial assurances" were not true throughout the Relevant Period, as detailed by Prendergast in a sworn declaration, and Defendants failed to correct any of their earlier false statements, resulting in millions of dollars of losses to Plaintiffs.

8.     As detailed herein, Defendants knew or should have known that their representations were not true. Defendant Prendergast's declaration admits that "[s]hortly after emerging from the [2024 Bankruptcy], the Company realized that ongoing operational and financial concerns were still looming that would require the support of strategic advisors."[4] Indeed, JOANN had retained Alvarez & Marsal ("A&M") to provide interim management and other services in connection with the Company's restructuring efforts as early as May 2024. Prendergast

---

[3]   *See In re JOANN INC.*, Case No. 25-10068 (Bankr. D. Del.), Declaration of Michael Prendergast, Interim Chief Executive Officer, In Support of Chapter 11 Petitions and First Day Motions, Jan. 15, 2025, Docket No. 5 ("Prendergast Declaration" or "Prendergast Decl."), at ¶ 62.

[4]   Prendergast Declaration at ¶ 55.

also admitted that JOANN was experiencing significant inventory issues as early as the summer and into the fall of 2024 and that "[r]evenue and profitability fell linearly with the record-low in-stock levels, making it difficult to service even the restructured debt load resulting from the [2024 Bankruptcy]."[5] By September 2024, JOANN expanded A&M's engagement to assist with cost-saving initiatives, which included renegotiating payment terms and rebates with JOANN's vendors.

9.     In August 2024, the agent for JOANN's secured term loan facility required that JOANN create a $10 million reserve under JOANN's credit agreement,[6] which restricted JOANN's liquidity. In addition, in December 2024, the agent for JOANN's secured revolving credit facility required that reserves total $80 million, which crippled JOANN's liquidity.[7] And by December 9, 2024, JOANN had retained Centerview Partners, LLC ("Centerview") to assist with the sale of the Company or other financing options.[8] Thus Defendants knew (or should have been aware) that JOANN's declining liquidity would cripple, or at least jeopardize – the Company's ability to pay Plaintiffs for goods shipped on credit.

10.     Defendants knew (or should have known) these facts, and Defendants also knew that Plaintiffs did not know these facts. But Defendants failed to reveal the truth and did not correct their earlier false statements to Plaintiffs. Defendants also did not direct the Company's employees to stop ordering goods from Plaintiffs on credit. Instead, Defendants concealed the truth and

---

[5]   *Id*. at ¶ 67.

[6]   *See In re JOANN INC*., Case No. 25-10068 (Bankr. D. Del.), Omnibus Objection to the Official Committee of Unsecured Creditors to Debtors' Motions (I) For Entry of an Order Approving Bidding Procedures and Stalking Horse Agreement; and (II) For Entry of a Final Order Authorizing the Use of Cash Collateral, filed Feb. 8, 2025, Docket No. 338 ("Omnibus Objection"), Ex. B (1903P Loan agent, LLC's Letter Regarding Notice of Availability Reserve, dated Aug. 16, 2024).

[7]   *See* Bank of America N.A.'s Letters Regarding Notices of Establishment of Reserve, dated Dec. 6, 2024 and Dec. 17, 2024 (Exhibit C to Omnibus Objection).

[8]   *Id*. at ¶ 55.

continued to fraudulently, recklessly and/or negligently misrepresent facts to Plaintiffs concerning the Company's ability to pay Plaintiffs for all goods shipped on credit, stating that JOANN's future was bright. This continued as the Company's financial position spiraled downward and up to January 15, 2025 (the "<u>Petition Date</u>"), when JOANN once again filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>2025 Bankruptcy</u>"). As of the Petition Date, JOANN owed approximately $615.7 million of outstanding secured debt, and owed an estimated $133 million to general unsecured creditors, including trade vendors and landlords. JOANN largely attributed its 2025 Bankruptcy filing to inventory shortages resulting from vendors' failure to ship products, coupled with a sluggish retail economy, including high interest rates and inflation.

11.     The fact is that Plaintiffs justifiably relied on Defendants' misrepresentations, particularly in light of their longtime business relationships with JOANN, and shipped goods to JOANN on credit. Defendants' negligent misrepresentations and/or fraudulent misrepresentations or acts have caused Plaintiffs losses of more than $40 million.

12.     To hold Defendants accountable, Plaintiffs bring this action asserting claims of negligent misrepresentation and common law fraud/fraudulent misrepresentation.

## PARTIES

13.     Plaintiff Advantus, Corp. ("<u>Advantus</u>") is a corporation organized under the laws of Florida, and has its principal place of business in Jacksonville, Florida. Advantus is a consumer products company comprised of five operating divisions, each of which contain a family of related businesses and product lines, including (i) commercial office products, (ii) craft and hobby

products, (iii) home and office organization, (iv) pool and recreation products, and (v) luggage and tactical.

14.    Plaintiff Fairfield Processing Corp. ("Fairfield") is a corporation organized under the laws of Missouri, and has its principal place of business in Danbury, Connecticut. Fairfield is a leading manufacturer of cotton and polyester fiber products, whose products include, *iter alia*, Poly-fil®, NU-Foam®, pillow inserts; recreational pillows; cotton and polyester batting.

15.    Plaintiff Gwen Studios, LLC is ("Gwen Studios") is a limited liability company organized under the laws of South Carolina, and has its principal place of business in Fort Mill, South Carolina. Gwen Studios is a manufacturer and distributor of craft and hobby supplies, home décor and children's activities and toys.

16.    Plaintiff Low Tech Toy Club LLC ("Low Tech Toy") is a limited liability company organized under the laws of New York, and has its principal place of business in Chapel Hill, North Carolina. Plaintiff Low Tech Toy manufactures and distributes learn-to-crochet kits and related products.

17.    Plaintiff Ormo Ithalat Ihracat A.S. ("Ormo") is a producer, importer and exporter of handknitting yarns based in Istanbul, Turkey. While Ormo is based in Turkey, Ormo attended several meetings at JOANN's headquarters in Hudson, Ohio, and several of Defendants' misrepresentations to Ormo were made in Ohio.

18.    Plaintiff Springs Creative Product Group, LLC ("Springs Creative") is a limited liability company organized under the laws of South Carolina, and has its principal place of business in Rock Hill, South Carolina. Springs Creative is a textile and service business that supplies retail fabrics, finished products, packaged crafts and specialty fabrics.

19.    From March 25, 2024 through the Petition Date (the "Relevant Period"), Plaintiffs were trade vendors who justifiably relied upon Defendants' false, reckless or negligent misrepresentations in supplying goods and services to JOANN on credit and, as a result of Defendants' wrongful acts, suffered losses.

20.    Defendant Michael Prendergast was appointed as JOANN's Interim Chief Executive Officer on or about June 7, 2024.[9] Since December 2021, Prendergast has served as a Managing Director in Alvarez & Marsal's Consumer and Retail Group, and he served as a Senior Director from May 2018 to December 2021. As the Interim Chief Executive Officer of JOANN, Defendant Prendergast was a key spokesperson for JOANN with each of the Plaintiffs. Upon information and belief, Prendergast resides in and is a citizen of New York.

21.    Defendant Jeffrey Dwyer was appointed as JOANN's Interim Chief Financial Officer on July 29, 2024. Dwyer has served as a Managing Director of Alvarez & Marsal since January 2023 and served as a Senior Director from November 2018 to January 2023, a Director from April 2008 to November 2018, and a Senior Associate from February 2008 to April 2008. As the Interim Chief Financial Officer of JOANN, Defendant Dwyer was a key spokesperson for JOANN with each of the Plaintiffs. Upon information and belief, Dwyer resides in and is a citizen of Chicago, Illinois.

22.    Defendant Melissa Bowers served as the Director of Accounting Operations at JOANN since December 2018 through the Petition Date. Over the past 17 years, Bowers has held various positions at JOANN, including: Manager, Lease Accounting from November 2013 to

---

[9]    On June 7, 2024, JOANN issued a press release announcing the appointment of Prendergast as Interim CEO (*See JOANN Announces Board of Directors, Interim CEO*, June 7, 2024, *available at* https://www.globenewswire.com/news-release/2024/06/07/2895393/0/en/JOANN-Announces-Board-of-Directors-Interim-CEO.html), however, the Prendergast Declaration filed in support of JOANN's bankruptcy Petition discloses that Prendergast was appointed as JOANN's Interim CEO "in May 2024." Prendergast Decl., at ¶ 2.

December 2018; Manager, Vendor Accounting from March 2012 through December 2013; Supervisor, Lease Accounting from March 2009 to March 2012; and Senior Accountant, Lease Accounting from December 2007 to June 2009. Upon information and belief, Bowers resides in and is a citizen of Munroe Falls, Ohio.

23.     Defendant Christopher DiTullio served as JOANN's Executive Vice President and Chief Customer Officer from October 2019 to January 2025. Following the resignation of then-President and Chief Executive Officer of JOANN, Wade Miquelon on May 8, 2023, JOANN appointed DiTullio, along with Scott Sekella, to serve as co-leads of the Interim Office of the Chief Executive Officer until May 2024, when Prendergast was as JOANN's Interim Chief Executive Officer. Upon information and belief, during the Relevant Period, DiTullio resided in and was a citizen of Hudson, Ohio.

24.     Defendant Heather Holody served as JOANN's Vice President, General Merchandising Manager of Sewing, since January 2021 through the Petition Date. Holody served as JOANN's Divisional Merchandise Manager from November 2018 to January 2021, and as a Buyer from January 2017 to November 2018. Upon information and belief, Holody resides in and is a citizen of Akron, Ohio.

25.     Defendant Michael Kennedy served as JOANN's Vice President, General Merchandise Manager since November 2019 through the Petition Date. Kennedy's prior positions at JOANN include Divisional Merchandise Manager from February 2018 to November 2019 and Buyer from April 2017 to February 2018. Upon information and belief, Kennedy resides in and is a citizen of Ashtabula, Ohio.

26.     Defendant Robert Will served as JOANN's Chief Merchandising Officer from October 2019 through the Petition Date. Will served as JOANN's Senior Vice President of

eCommerce and General Merchandising Manager of Craft from April 2019 to October 2019, and Senior Vice President/General Merchandising Manager, Craft Division from September 2016 to October 2019. As the Chief Merchandising Manager, Will was the main spokesperson for JOANN with each of the Plaintiffs. In that role, Will had a previous and continuing relationship with each Plaintiff going back many years before May 2024. Upon information and belief, Defendant Will resides in and is a citizen of Nashville, Tennessee.

27.      Non-party Alvarez & Marsal is a professional services firm that provides advisory, business performance improvement and turnaround management services. A&M was engaged by JOANN in February 2024 to provide interim management and other services, including in connection with the Company's restructuring efforts. JOANN's court filings relating to the 2025 Bankruptcy disclose that A&M was engaged because "[s]hortly after emerging from the Prior Cases, the Company realized that ongoing operational and financial concerns were still looming that would require support of strategic advisors."[10] JOANN previously engaged A&M in February 2023 to assist JOANN with cost-reduction initiatives, forecast models, and other services prior to the 2024 Bankruptcy.[11] A&M is currently JOANN's financial advisor in connection with the 2025 Bankruptcy.

## JURISDICTION AND VENUE

28.      This Court has jurisdiction over this matter pursuant to Ohio Rev. Code § 2305.01.

29.      During the Relevant Period, each Defendant was employed by JOANN, whose headquarters are located in Summit County, Ohio, and all the facts supporting the claims in this

---

[10]  *See* Prendergast Decl., at ¶ 55.

[11]  *See* 2024 Chapter 11 Case, Declaration of Scott Sekella, Chief Financial Officer and Executive Vice President, in Support of Chapter 11 Petition and First Day Motions, Mar. 18, 2024, *In re JoAnn, Inc., et al.*, Case No. 24-10418 (Bankr. Dl. Del.), Docket No. 2, at ¶ 10, ("Sekella Decl.").

case occurred and arose in Summit County, Ohio. Thus, the Court has personal jurisdiction over each Defendant because he or she resides or regularly transacts business in the State of Ohio, contracted to supply goods and services within the State of Ohio, or have the requisite minimum contacts with Ohio necessary to constitutionally permit the Court to exercise jurisdiction over them.

30.    During the Relevant Period, each Defendant was employed by JOANN, whose headquarters are located in Summit County, Ohio, and all the facts supporting the claims in this case occurred and arose in Summit County, Ohio.

31.    Venue is proper in this Court pursuant to Ohio Civ. R. 3(C)(1), 3(C)(3) and 3(C)(6), because Defendants reside in, or conducted activity that gave rise to Plaintiffs' claims for relief in, Summit County.

## FACTUAL ALLEGATIONS

### A.    Background

#### 1.    JOANN History and the 2024 Bankruptcy

32.    JOANN is a national retailer of sewing, arts and crafts, and select home décor products. Since founded in 1943, JOANN experienced substantial growth and, by 1969, became a public company.[12] In 2011 JOANN was purchased by Leonard Green & Partners and taken private.[13] The Company went public again in March 2021. In connection with the 2024 Bankruptcy, JOANN emerged as a private company. As of the Petition Date, JOANN operated 800 stores across 49 states and employed approximately 19,000 employees.[14]

---

[12]  *See* Prendergast Decl., at ¶¶ 21-22.

[13]  *Id*. at ¶ 22.

[14]  *See* Prendergast Decl., at ¶¶ 29, 43.

33.     Leading up to the 2024 Bankruptcy, JOANN was facing increased competition, rising interest rates, an overleveraged balance sheet, and diminishing liquidity.[15] JOANN commenced its 2024 Bankruptcy on March 15, 2024 to implement a balance sheet restructuring through a prepackaged plan of reorganization.

34.     In connection with the 2024 Bankruptcy, JOANN retained A&M in February 2023, JOANN's current financial advisor, to assist with cost-reduction initiatives and, in June 2023, directed A&M to assist in developing a long-term forecast model.[16]

35.     Under JOANN's 2024 Restructuring Plan, JOANN reduced its then existing $1.06 billion of secured debt in half by converting approximately $500 million in term loan debt into equity and refinancing the Company's prior loan facilities.[17] The 2024 Restructuring Plan was confirmed on April 25, 2024, and became effective on April 30, 2024.[18]

36.     As part of the 2024 Restructuring Plan, the Company's loan facilities were amended and restated. JOANN emerged with a $500 million revolving credit facility (the "ABL Facility") and a $100 million term loan facility (the "FILO Facility").[19] JOANN's term loan lenders also provided the Company with an approximately $153.8 term loan facility.[20]

37.     The 2024 Restructuring Plan was confirmed on April 25, 2024, and became effective on April 30, 2024. The Company emerged from the 2024 Bankruptcy with its debt cut in half, $132 million of new capital via the exit facilities, and 96% of stores were "four-wall" cash

---

[15]  *See* Sekella Decl., at ¶¶ 44, 68-72.

[16]  *See* Sekella Decl., at ¶ 10.

[17]  2024 Chapter 11 Case, *Order (I) Approving the Disclosure Statement and (II) Confirming the First Amended Prepackaged Joint Plan of Reorganization of JOANN Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code,* Docket No. 303, at ¶ 31.

[18]  2024 Chapter 11 Case, Docket Nos. 303, 318.

[19]  *See* Prendergast Decl., at ¶ 46.

[20]  *See* Sekella Decl., Ex. B, at p. 3.

flow positive.[21] JOANN's financial projections projected an adjusted EBITDA of $152 million in 2025 and $201 million in 2026.[22]

**B.** *Plaintiffs' Business Relationships with JOANN*

38.     JOANN's business depends on an extensive network of vendors, including Plaintiffs, that it relies on to provide the goods and services that are necessary for the Company to operate its stores and generate revenue.[23] The majority of its vendors conduct business with JOANN on a purchase order-by-purchase order basis and are paid on prearranged terms.[24]

39.     Plaintiff Advantus, along with its predecessors, acquired, and/or related entities, began doing business with JOANN in or about 1995. Over the course of their 30-year relationship, Advantus had numerous conversations, meetings and correspondence with JOANN representatives, including Defendants. Advantus sold goods and services to JOANN on credit and, as a result of Defendants' wrongful acts, suffered losses.

40.     Plaintiff Fairfield began doing business with JOANN in or about 1985. Over the course of their 40-year relationship, Fairfield had numerous conversations, meetings and correspondence with JOANN representatives, including Defendants. Fairfield sold goods and services to JOANN on credit and, as a result of Defendants' wrongful acts, suffered losses.

41.     Plaintiff Gwen Studios began doing business with JOANN in or about 2020. During the course of that relationship, Gwen Studios had numerous conversations, meetings and correspondence with JOANN representatives, including Defendants. Gwen Studios sold goods and services to JOANN on credit and, as a result of Defendants' wrongful acts, suffered losses.

---

[21]  *See* Sekella Decl., at ¶8.

[22]  *See* 2024 Chapter 11 Case, Docket No. 16, Ex. D (Disclosure Statement).

[23]  *See* 2024 Chapter 11 Case, Trade Vendors' Motion, at ¶ 7.

[24]  Sekella Decl., at ¶ 53.

42.  Plaintiff Low Tech Toy began doing business with JOANN in or about September 2023. During the course of that relationship, Low Tech Toy had several conversations, meetings and correspondence with Defendants Will, Prendergast and Dwyer. Low Tech Toy sold goods and services to JOANN on credit and, as a result of Defendants' wrongful acts, suffered losses.

43.  Plaintiff Ormo began doing business with JOANN in or about 2021. During the course of their relationship, Ormo has numerous conversations, meetings, including in-person meetings, and correspondence with JOANN representatives, including Defendants. Ormo considered its relationship with JOANN to be close, but professional, and would even attend trade shows with Defendants Will and DiTullio and dinners with Defendant Will and other JOANN representatives. Ormo sold goods and services to JOANN on credit and, as a result of Defendants' wrongful acts, suffered losses.

44.  Plaintiff Springs Creative began doing business with JOANN in or about 2005. Over the course of their 20-year relationship, Springs Creative had several conversations, meetings and correspondence with JOANN representatives, including Defendants. Springs Creative sold goods and services to JOANN on credit and, as a result of Defendants' wrongful acts, suffered losses.

**C.**  ***Defendants' Wrongful Conduct During the Relevant Period***

45.  Defendants highlighted JOANN's financial strength and made assurances to Plaintiffs that JOANN had the financial means to pay Plaintiffs for the goods JOANN ordered on credit.

46.  On April 30, 2024, the effective date of the 2024 Restructuring Plan, JOANN issued a press release stating that JOANN's restructuring process had "substantially reduced [the Company's] funded debt by half while further enhancing the previously announced debtor-in-

15

possession financing. The prepackaged Chapter 11 plan … enable[ed] JOANN to be in "the best financial position in recent history." In that press release, Defendant DiTullio, JOANN's then-Chief Customer Officer and Co-Lead of the Interim Office of the CEO, also stated "we are now moving forward on the strongest financial foundation in many years."[25]

47.     Defendants knew and intended that these representations would be viewed by trade vendors, including Plaintiffs. Indeed, JOANN had prepared and disseminated to certain vendors a "Vendor Presentation," dated March 25, 2024, that included similar information, for the specific purpose of informing its vendors of the Company's strong financial foundation after the 2024 Bankruptcy (as detailed below). And Defendants knew and intended that Plaintiffs would rely upon these representations and that the representations provided Plaintiffs with assurances that if the Plaintiffs shipped goods to JOANN on credit, then JOANN had the ability to pay for the goods.

### 1.     Misrepresentations and Negligent Misrepresentations to Plaintiffs During the Relevant Period (March 25, 2024 to January 15, 2025)

#### a.     Misrepresentations and Negligent Misrepresentations to *Advantus* During the Relevant Period (March 25, 2024 to January 15, 2025)

48.     Following the 2024 Bankruptcy, JOANN approached Advantus to extend the Company's payment terms from 60 days to 90 days, and Advantus agreed.

49.     On May 21, 2024, Advantus had a phone call with Defendants Will and Prendergast, and Scott Sekella ("Sekella"), JOANN's then-CFO and co-chair of the office of the interim CEO, during which Prendergast explained why JOANN had filed the 2024 Bankruptcy. Scott Sekella stated during the meeting that, despite JOANN's remaining debt following the 2024

---

[25]   *JOANN Enters New Era of Creativity Poised to Serve the Sewing, Craft and DIY Industry with Lowest Level of Debt in More than a Decade*, Press Release (Apr. 30, 2024), *available at* https://www.joann.com/c/newsroom/press-releases/joann-enters-new-era-of-creativity-poised-to-serve-the-sewing-craft-and-diy-industry-with-lowest-level-of-debt-in-more-than-a-decade/.

Bankruptcy, "JOANN could even shrink the top line and still service the debt and remain profitable," and that JOANN was projecting sales growth as inventory levels normalized, but that was not necessary to service the debt and be profitable. Defendant Will stated that he estimated that JOANN's inventory levels would normalize in approximately two months, and that JOANN needed vendors it could count on to replace other vendors, if needed, to grow the Company's inventory. In other words, Defendant Will was seeking Advantus' assurance that it would continue to ship to JOANN on credit by offering Advantus the prospect of more business.

50.    Relying on the representations made at the May 21, 2024 meeting, Advantus sent an email to Defendant Will on May 23, 2024, seeking the "new business" that Defendant Will mentioned during the May 21 meeting, stating in relevant part, "I appreciate you guys taking the time to talk with me and the information you all shared," and "Please let me know if we can assist Mike [Kennedy] and Heather [Holody] with the vendor issue you mentioned, and we'll begin working on it immediately." Advantus received no response from Defendant Will, but Advantus proceeded to fill the orders placed by JOANN on credit based upon assurances made at the May 21, 2024 meeting.

51.    Shortly after the May 21, 2024 meeting, JOANN placed a large order with Advantus. Because of the sizeable order, Advantus requested that JOANN forward financial statements to verify it had sufficient cash to pay for the Company's orders on credit. JOANN provided Advantus with its first quarter 2025 financial report after Advantus signed a non-disclosure agreement. Advantus then agreed to provide and ship product to JOANN on credit after being assured by JOANN it had sufficient liquidity for 12 months. JOANN also provided its second quarter 2024 financials to Advantus on November 19, 2024, per its request, but the Company refused to provide Advantus with its third quarter 2024 financial information.

52. On November 2 and November 21, 2024, Defendants Dwyer and Will, respectively, each told Advantus: "We appreciate your partnership and look forward to driving mutual growth." And by November 29, 2024, JOANN owed Advantus $1.67 million for goods shipped on credit.

53. Advantus continued to ship goods to JOANN on credit until approximately November 2024, when JOANN had a past due balance of over $1 million with Advantus.

        **b.**       **Misrepresentations and Negligent Misrepresentations to** ***Fairfield*** **During the Relevant Period (March 25, 2024 to January 15, 2025)**

54. Shortly after it emerged from the 2024 Bankruptcy, JOANN sought to renegotiate its shipping and payment terms with Fairfield. Approximately six to nine months prior to JOANN's 2024 Bankruptcy, Plaintiff Fairfield had stopped shipping product to JOANN because it was significantly behind on payments to Fairfield. At that time, Fairfield and JOANN agreed to do business on a cash-before-delivery basis, meaning JOANN would pay for the goods it ordered from Fairfield before Fairfield shipped product to JOANN. When JOANN emerged from the 2024 Bankruptcy, JOANN would not agree to a cash-before-delivery relationship. Instead, on or about March 20, 2024, Plaintiff Fairfield agreed to ship products to JOANN on credit, but imposed a credit line of $750,000 on JOANN, with a 30-day payment term. When the credit limit was reached, JOANN was required to make sufficient payment to Fairfield to stay within the credit limit. During this timeframe, JOANN made several representations that the Company had "never been in a better financial position."

55. Following that agreement, the orders JOANN placed with Fairfield were uncharacteristically large, so Fairfield agreed to give the Company a larger credit line, with a 45-day payment term, and, ultimately, in approximately October 2024, Fairfield agreed to increase JOANN's credit line to $2.5 million, with a payment term of 65 days to accommodate JOANN's large orders, contingent upon Fairfield's ability to secure Trade Risk insurance. Also in October

2024, JOANN offered Fairfield additional business with JOANN, which was likely done in an effort to induce Fairfield to agree give JOANN the increased credit limit of $2.5 million. Fairfield was unsuccessful in securing any Trade Risk insurance coverage, however JOANN was already utilizing the full $2.5 million of credit.

56.    From April 1, 2024 through January 16, 2025, Fairfield and Defendant Holody exchanged more than 30 text message conversations concerning payment delays caused by JOANN, JOANN's outstanding accounts receivable, order and shipping details and other issues. On August 16, 2024, after several text messages concerning JOANN's late payments, Fairfield asked Defendant Holody: "I'm not getting responses from anybody, should I be concerned?" Defendant Holody assured Fairfield, "no you should not be concerned there has been an overwhelming amount of emails flowing based on a slight change i[n] the day we release payments – so could be lost in the shuffle." In fact, in several of these communications with Fairfield, Defendant Holody actively participated in encouraging Fairfield to believe that JOANN's missing payments were caused by errors or mishaps and that it was business as usual.

57.    In May 2024, Fairfield had numerous phone calls with JOANN, including Defendant Will, during which Fairfield was told that JOANN's business was strong and that the Company had never been in a better financial position.

58.    By June 27, 2024, JOANN was already $437,000 past due on payments and had $2.68 million open accounts receivable with Fairfield, which was well over JOANN's credit limit of $1.5 million in place at that time.  On that same day, Fairfield informed Defendant Holody of the past due amount and credit limit overage, and Holody concealed the truth and attributed JOANN's nonpayment as a clerical error, stating: "this has to be our transitional terms confusing matters." And on July 1, 2024, Fairfield had a telephone call with Defendants Holody, Bowers and

Will during which Fairfield was informed that there was no wire coming, and that JOANN would pay when terms came due – JOANN refused to honor the payment terms it had renegotiated on May 21, 2024. For the next month, Defendants Bowers and Holody failed to respond to Fairfield's numerous requests for payment and explanation.

59.　　In late summer/early fall 2024, Fairfield had numerous telephone meetings with Defendants Dwyer, Prendergast, Will, Kennedy and Holody. During these meetings, while Fairfield was still receiving assurances that JOANN was in a strong financial position, Fairfield noticed "new language" about JOANN's strong financials, suggesting that the recently appointed interim officers, Defendants Prendergast and Dwyer, instructed Defendants Will and Holody what to say to Plaintiff Fairfield concerning the Company's performance.

60.　　By this time, Defendants knew JOANN was facing severe inventory and restocking challenges that would prevent JOANN from realizing the revenue projections that it needed to achieve to continue as a viable going concern, as detailed in the Prendergast Declaration.[26] Defendants also knew JOANN's inventory challenges had taken such a toll on the Company's liquidity that it could not service its debt load while responsibly operating the business.[27]

61.　　Plaintiff Fairfield had a call with Defendant Holody after the Petition Date during which Defendant Holody informed Fairfield that A&M was "so controlling," and that A&M, *i.e.* Defendants Prendergast and Dwyer, told everyone at JOANN what to say to vendors – including Plaintiffs –and how to say it.

---

[26]　*See* Prendergast Decl., at ¶ 62.

[27]　*Id*. at ¶ 69.

c.    **Misrepresentations and Negligent Misrepresentations to**
**_Gwen Studios_ During the Relevant Period (March 25, 2024**
**to January 15, 2025)**

62.    Gwen Studios began doing business with JOANN in or about 2020. During JOANN's 2024 Bankruptcy process, Gwen Studios had frequent conversations with Defendant Will regarding the Company's financial viability following the 2024 Bankruptcy. For example, on March 18, 2024, Gwen Studios congratulated Defendant Will on JOANN's new financing agreement, to which Will responded on March 20, 2024: "Tell China JOANN is paying them in full tomorrow! That is a fact! Any help you could offer to spread that this is incredible for JOANN and our vendors would be awesome!"  Following several conversations during this timeframe, Gwen Studios agreed to a meeting at the JOANN headquarters in Hudson Ohio on April 17, 2024.

63.    On April 17, 2024 Gwen Studios' CEO had two separate one-on-one meetings with members of the JOANN executive team. Gwen Studios first met with JOANN former CFO Sekella, who assured Gwen Studios that JOANN would be in the best financial position it had been in years when it emerged from the 2024 Bankruptcy at the end of April. Gwen Studios' CEO then met with Defendant Will to discuss various programs that JOANN had "awarded" to Gwen Studios. Because Gwen Studios had previously been hesitant to accept JOANN's new "business awards" due to the Company's financial troubles, Defendant Will reiterated Sekella's sentiment that the 2024 Bankruptcy would poise JOANN for financial strength and growth, stating: "we would have no problem obtaining credit insurance on JOANN's receivables very soon." Defendant Will further stated that Gwen Studios was a very important vendor to JOANN and emphasized that the Company would need future ribbon shipments, saying that he wanted "to get as much in stock at the stores as quickly as possible."  Defendant Will's assurances of JOANN's financial health and promises of additional business would soon lead to JOANN requesting numerous concessions from Gwen Studios.

64.     Based on discussions and assurances made by Defendant Will at the April 17, 2024 meeting, Gwen Studios agreed to a seasonal ribbon exclusivity agreement with JOANN, agreed to extend JOANN's payment terms, began negotiations with JOANN for a volume rebate, and agreed to quote various new programs, including Christmas gift packaging, paper entertaining, and everyday ribbon, which were valued at over $3 million, $1.2 million and $4.5 million, respectively. Gwen Studios accepted JOANN's orders in these new programs based on Defendant Will's assurances that JOANN was in the best financial position in years

65.     On May 28, 2024, CFO Sekella requested that Gwen Studios act as a trade reference for JOANN, which would mean Gwen Studios would recommend JOANN as a business partner if, for example, a new vendor or business supplier wanted assurances on JOANN prior to extending credit to the Company. Based on Defendant Will's and Sekella's representations that JOANN was financially sound, Gwen Studios agreed to act as a trade reference for JOANN and provided references from time to time beginning in June 2024. Sekella assured Gwen Studios that JOANN "really appreciate[d] the partnership!!!"

66.     On May 30, 2024, based on Defendant Will's representations at the April 17th meeting, Gwen Studios agreed to enter into an amended Import Master Vendor Contract to extend JOANN's payment terms from 3% Net 30 to Net 90.

67.     On July 25, 2024, JOANN requested that Gwen Studios contribute to the cost to expedite orders that were still in containers in China and India, and was told that JOANN was contacting all of its key suppliers for similar support. Ultimately, Gwen Studios agreed to pay $130,000 to assist in expediting JOANN's orders.

68.     On September 11, 2024, JOANN offered a new line of business to Gwen Studios relating to buttons, apparel, decor trim, tapes and braids, which Defendant Holody referred to as

an opportunity that was "the size of the prize." Defendant Holody stressed that JOANN was in desperate need of product and pushed Gwen Studios to ship as quickly as possible. Defendant Will reiterated to Gwen Studios that JOANN was in desperate need of product.

69.     On September 13, 2024, Gwen Studios had a videoconference meeting with Defendant Will and Stan Rosenzweig, JOANN's Executive Chairman of the Board, during which Gwen Studios' new line of business was discussed. During that meeting, Defendant Will told Gwen Studios that JOANN was in the best financial position it had been in for the past 10 years, and that the Company would soon have credit insurance available to the vendors through the banks, and "not to worry," as JOANN was working with the banks to get payments flowing to the vendors.

70.     On September 29, and through October 2024, Defendants Holody, Kennedy and other JOANN team members began to push Gwen Studios to ship product relating to the basic inline ribbon, button and trim programs faster, and as late as December 11, 2024, JOANN and Gwen Studios were working to complete the 2025 basic inline ribbon business.

71.     By this time, JOANN's lenders had imposed a collective $90 million reserve, which had crippled JOANN's liquidity, and the Company had retained Centerview to market the Company for sale. Nevertheless, Defendants did not, and were never instructed to, stop placing orders on credit with Gwen Studios, nor did they disclose that JOANN was facing financial peril and an impending sale, nor did Defendants correct their prior statements that JOANN was in the best financial position it had been in for years.

72.     On November 8, 2024, Gwen Studios met with Defendant Holody and other JOANN team members, during which Defendant Holody informed Gwen Studios that JOANN's current business was strong, citing Halloween and Harvest sell-throughs. Defendant Holody and Gwen Studios also discussed how quickly Gwen Studios could ship product.

73.     On November 12, 2024, Gwen Studios sent a text to Defendant Will stating that it had heard some "chatter that JOANN is paying late or in some instances not paying at all on payables due. … Anything I need to be concerned about?" Gwen Studios further asked: "Or … is that just "noise" from our last conversation where the new finance team is picking and choosing payables based on previous partnership or lack of [ ] to Joann"? Defendant Will sent a "thumbs up" emoji to confirm that Gwen Studios' concern was merely "noise."

74.     On November 20, 2024, JOANN insisted on moving up its Halloween ribbon shipment from April to March, 2025, which required Gwen Studios to rush production to complete the product by March 2025. Ultimately, Gwen Studios was "stuck" with JOANN's Halloween ribbon order when JOANN filed the 2025 Bankruptcy.

75.     By December 5, 2024, JOANN was $4.9 million past due on payments to Gwen Studios. That day, Gwen Studios approached Defendant Will about JOANN's past due invoices and sought payment. On December 6, 2024, Defendant Will told Gwen Studios that he "caught my CFO in the air late last night. Payments will start flowing next week."

76.     On December 10, 2024, JOANN had still not paid Gwen Studios, and Defendant Will sent a text message to Gwen Studios saying: "From Jeff (CFO) We are paying $3.5M this week, ~$3M next, and the balance thereafter." And on December 11, 2024, Defendant Will sent another text message to Gwen Studios that included a screen shot from Defendant Bowers identifying a pay date of December 12, 2024 on certain of Gwen Studios' invoices. While Gwen Studios had received a payment of approximately $400,000 from JOANN on December 12, 2024, JOANN was still past due on payments to Gwen Studios totaling approximately $3 million.

77.     As late as December 13, 2024, JOANN placed commitments with Gwen Studios, but Gwen Studios chose to take no action based on its growing concern of JOANN's declining

financial situation. On December 18, 2024, JOANN continued to push Gwen Studios to move forward with the buttons and trim business. Despite the fact that Defendants knew that JOANN had already retained Centerview by that date to market and sell the Company, Defendants failed to instruct JOANN employees to cease ordering goods from Gwen Studios. As a result of Defendants' failing to instruct JOANN employees to cease placing orders with Gwen Studios, Gwen Studios incurred significant losses, including freight and shipping costs, and production costs on inventory ordered by JOANN that had not been shipped prior to the 2025 Bankruptcy filing.

78.    On December 20, 2024, Gwen Studios and Defendant Will had a telephone call during which Will acknowledged that JOANN was late on payments, but stated that JOANN would be current by December 31, 2024. Defendant Will explained that Defendant Dwyer needed to end the month strong from a cash flow perspective for JOANN's bank, and that the late payments would be resolved soon.

79.    On January 9, 2025, Gwen Studios informed Defendant Holody that Gwen Studios would be stopping all activities on the private label button and trim programs. That same day, Gwen Studios also advised Defendant Kennedy that the basic inline ribbon business going forward would be ceased.

      *d.*    **Misrepresentations and Negligent Misrepresentations to *Ormo* During the Relevant Period (March 25, 2024 to January 15, 2025)**

80.    Ormo began doing business with JOANN in approximately 2021. Ormo's business relationship with JOANN, particularly through Defendant Will, was close but professional, and several times a year, JOANN representatives would visit Ormo's facilities in Turkey, and Ormo would visit JOANN's headquarters in Hudson, Ohio.

81.     Plaintiff Ormo repeatedly and diligently asked JOANN for assurances that the Company was financially sound, including during JOANN's 2024 Bankruptcy and through the filing of the 2025 Bankruptcy. In response to its inquiries, Ormo was repeatedly told that JOANN was in the best financial position in years.

82.     On May 2, 2024, Ormo met Defendants Will and DiTullio at the Chicago Trade Show, which was followed by a dinner. On that same day, Defendant Will sent a message to Ormo on WhatsApp, stating "Very much appreciated our friendship as much as our business!"

83.     June 22, 2024, Ormo met with Defendant Will and other JOANN representatives for a dinner in Amsterdam. Following the dinner, Defendant Will sent a message to Ormo on WhatsApp stating, "Thank you for the partnership and friendship! I am very excited to see what the next year brings."

84.     On October 2, 2024, Defendant Will sent an email to Ormo concerning JOANN's request that Ormo pay JOANN $842,000 for "margin support." Following that email and a phone call with Defendants Will, Prendergast and Dwyer, Defendant Will sent a message to Ormo on WhatsApp, stating "I appreciated your response to our call very much. It reinforced everything I have shares [with] our interim CEO and CFO. They clearly understand now how special this partnership is."

85.     On December 3, 2024, Ormo attended an in-person meeting with Defendants Will, Prendergast, and Dwyer at JOANN's offices in Hudson, Ohio. During that meeting, Defendants Will, Dwyer and Prendergast each assured Ormo that JOANN's business was very healthy and it was not experiencing any financial problems. Defendant Dwyer explained to Ormo that the Company was doing well and, in response to Ormo's concerns of being an unsecured lender, Defendant Dwyer stated that JOANN would make Ormo a secured lender. During the meeting,

Case 25-51022-CTG    Doc 1-1    Filed 06/13/25    Page 28 of 70

Defendant Prendergast assured Ormo that JOANN was financially doing well and also stated that a new, permanent CEO had been selected and the Company would announce the new CEO at the end of December 2024.  Needless to say, none of representations made by Defendants Prendergast or Dwyer to Ormo during that December 3rd meeting were true.

86.     On December 4, 2024, Defendant Will sent a message to Ormo on WhatsApp, stating "I cannot thank you enough for all of your support and partnership! … I know we can push this business to $50M+! Thanks for bringing the innovation! I am confident we will find ways to optimize our order flow and drive more profitable growth for both of us!"

87.     By this time, since the summer/fall of 2024, Defendants knew the Company was facing major inventory challenges that prevented JOANN from realizing the revenue projections it needed to achieve to continue as a viable going concern.[28] Defendants also knew since the fall 2024 that the Company's liquidity had suffered too greatly to allow it to service its debt load while responsibly operating the business.[29] Defendants further knew that the agent on the FILO Facility imposed a $10 million reserve under JOANN's credit agreement in August 2024. And just five days after Defendant Will's representation that JOANN and Ormo could push their business to about $50 million, the Company retained Centerview to market and sell the business.

88.     Based on Defendants Will, Dwyer and Prendergast's representations and assurances at, and prior to, the December 4, 2024 meeting, Ormo continued to provide goods to JOANN on credit until the Petition Date.

---

[28]  *See* Prendergast Decl., at ¶ 62.

[29]  *Id*. at ¶ 69.

89.     Immediately following the Petition Date, JOANN cancelled all of its outstanding orders placed with Ormo, including orders that had already been produced according to JOANN's specifications and private labels, and, thus, could not be resold.

90.     Defendants Will, Dwyer and Prendergast (i) knew that these representations were false, (ii) knew and intended that Ormo would rely upon these representations, and (iii) knew that their representations provided Ormo assurance that JOANN had the ability to pay for goods shipped on credit and that JOANN intended or expected to continue to business with Ormo in the future.

          **e.**      **Misrepresentations and Negligent Misrepresentations to** ***Springs Creative*** **During the Relevant Period (March 25, 2024 to January 15, 2025)**

91.     Springs Creative began doing business with JOANN in approximately 2005. Shortly before JOANN emerged from the 2024 Bankruptcy, the Company provided Springs Creative with a "Vendor Presentation," dated March 25, 2024, which included details concerning JOANN's 2024 Bankruptcy restructuring. The Vendor Presentation included representations on "key points," including the "Transaction to reduce debt by $505 million," and "$132 million of new capital." The Vendor Presentation also represented that "[p]ayments were made last week to catch up all past due invoices. We need your support to grow by extending payment terms."

## Key Points

➤ No impact to stores or operations

➤ Transaction to reduce debt by $505 million

➤ $132 million of new capital

➤ All vendors to be paid in full

➤ We expect to emerge from Chapter 11 in 45 days

> **Payments were made last week to catch up all past due invoices.**
> **We need your support to grow by extending payment terms.**

JOANN



92.     JOANN's Vendor Presentation also included two performance level charts, which included past and projected yearly net sales, which increased incrementally over the projected three years, and past and projected yearly adjusted EBITDA, which increased significantly over the projected three years. Above the charts included the statement "We are returning to historical financial performance levels." JOANN knew and intended that these representations would provide its vendors – including Plaintiff Springs Creative – assurances that if they continued their business with JOANN and shipped goods to JOANN on credit, then JOANN had the ability to pay for the goods.

93.     Following JOANN's emergence from the 2024 Bankruptcy, JOANN renegotiated its payment terms with Springs Creative and obtained a 65-day payment term (from a 30-day payment term) for goods ordered on credit from Springs Creative.

94.     In May 2024, Springs Creative began receiving large, unprecedented orders from JOANN, which continued over the next several months. Springs Creative ran up its accounts

receivables to get JOANN's inventory levels up following the 2024 Bankruptcy, with accounts receivables up to $4 million by June 2024.

95.     On June 19, 2024, Springs Creative approached Defendants Will and Holody concerning the $4 million Springs Creative had extended in credit to JOANN and requested that JOANN agree to a 30-day payment term in exchange for a 2% discount for July and August 2024 payables to close the gap on the large amount of credit outstanding to JOANN. Defendant Will responded: "[u]nfortunately, this deal does not work for us. We are in the best financial position we have been in for over 12 years and this the lowest risk to you and your bankers."

96.     Based on Defendant Will's representation, Springs Creative continued to provide goods to JOANN on credit.

97.     On October 17, 2024, Springs Creative had a call with Defendants Prendergast, Dwyer and Will, during which Defendant Prendergast discussed JOANN's strong financial position and explained JOANN's "three prong strategy" for growth.

98.     On October 21, 2014, as detailed below, Defendant Will made representations that JOANN and Springs Creative could focus on "growth initiatives to drive our business!"

99.     By October 2024, Defendants knew that their representations concerning JOANN's financial strength and its ability to pay for goods shipped on credit were false. As detailed in in the Prendergast Declaration, Defendant Prendergast explained that JOANN was facing inventory shortages and poor sales by the summer and into the fall of 2024 that would prevent the Company from realizing the revenue projections that it needed to achieve to continue as a viable going concern.[30] By the fall of 2024, Defendants knew the Company's inventory struggles had caused the Company's liquidity to suffer too greatly to allow it to service its debt load while responsibly

---

[30]   *See* Prendergast Decl., at ¶¶ 62, 67.

operating the business.[31] Defendants further knew that in August 2024, the agent on the FILO facility imposed a $10 million reserve under the credit agreement, further jeopardizing JOANN's liquidity.

100.    By October 25, 2024, JOANN owed Springs Creative a past due amount of $800,000, and, by December 6, 2024, the past due amount had grown to $1.4 million. Although JOANN had paid some of its outstanding balance, by December 30, 2024, JOANN's past due amount was $601,000.

> **f.    Misrepresentations and Negligent Misrepresentations to *Low Tech Toy* During the Relevant Period (March 25, 2024 to January 15, 2025)**

101.    Plaintiff Low Tech Toy began doing business with JOANN in late-2023. Following JOANN's emergence from the 2024 Bankruptcy, Defendant Will and Low Tech Toy had a video conference on Microsoft Teams during which Will stated that JOANN wanted to renegotiate the parties' master service agreement to extend payment terms from net 90 days to net 120 days, and Low Tech Toy agreed to the extended payment term.

102.    On August 8, 2024, Low Tech Toy had an in-person meeting with Defendant Will and other JOANN representatives at JOANN's headquarters in Hudson, Ohio. During that meeting, JOANN gave Low Tech Toy a PowerPoint presentation detailing the financial status of the Company. Low Tech Toy was told that JOANN had "really bad debt," and the 2024 Bankruptcy freed the Company of that debt, and now JOANN was "in a very strong financial position." Low Tech Toy was further informed that JOANN was "four-wall cash flow positive in over 90% of its stores," and that JOANN was a very healthy business that was bogged down with bad debt that it got rid of in the 2024 Bankruptcy. Low Tech Toy was also told that one of the

---

[31]    *Id.* at ¶ 69.

challenges JOANN faced after the 2024 Bankruptcy was that vendors stopped shipping, so the Company was playing "catch up" from an inventory perspective. Defendant Will and the other JOANN representatives emphasized that the Company needed to get more inventory from Low Tech Toy to keep its stores well stocked. Defendant Will and Low Tech Toy also discussed a "store-to-store" concept, which included in-store activations and events, in-store branded sections of Low Tech Toy's products, and marketing and social collaborations, among other things, that would require a good amount of development work for both Low Tech Toy and JOANN.

103.    Following the August 8, 2024 meeting, Low Tech Toy and JOANN had a few additional meetings to discuss the store-to-store concept, which would be a multi-year long partnership. Based on JOANN's enthusiasm, excitement and commitment to a store-to-store concept, Low Tech Toy believed that JOANN's executive team did not have any short-term concerns about the viability of the business since JOANN and Low Tech Toy discussed a multi-year long business project.

104.    Following the August 8, 2024, Low Tech Toy began to ship significantly more inventory to JOANN on credit, including additional new products, which included 20 shipments of product in August and September 2024, alone, totaling $5.13 million.  Some of the crochet kits ordered by JOANN required Low Tech Toy to pay licensing fees, which ultimately would not be reimbursed by JOANN.

105.    On September 10, 2024, Low Tech Toy again met with Defendants Will and Kennedy, along with other members of the JOANN "team," to continue discussions of the store-to-store concept for Low Tech Toy's products, and Low Tech Toy provided a multi-page presentation it had prepared detailing various concepts for the store-to-store project.

106.    On October 3, 2024, Low Tech Toy had a video conference with Defendants Will, Prendergast and Dwyer, as well as another A&M representative. During the meeting, Low Tech Toy was told that JOANN was having meetings with all of its top vendors to give perspective on where JOANN was, how things were going, and moving forward. Defendants Will, Prendergast and Dwyer also explained that JOANN was speaking to vendors about margin gaps and fill rate challenges, but that Low Tech Toy did not have those issues with JOANN. Defendant Dwyer also stated that JOANN was a $2.5 billion business, with great EBITDA and cash flow for most of the time, and the Company had enhanced marketing, introduced new products and increased online sales. Low Tech Toy was also informed that JOANN wanted to discuss opportunities to grow its business with Low Tech Toy, and Defendant Will stated he thought Low Tech Toy could do $8 million to $10 million worth of business with JOANN in the next year. Defendant Will also stated that JOANN was seeking exclusivity with Low Tech Toy for one or two years – to the exclusion of JOANN's three biggest competitors: Michaels, Hobby Lobby and Wal-Mart. Defendant Will further asked Low Tech Toy what its response would be if JOANN wanted to double its business immediately and stated that he would send later that day the opportunities to feature Low Tech Toy and its products on JOANN's website. Defendant Will further stated that he thought JOANN could triple Low Tech Toy's online presence, which was currently only 8% on JOANN's website. Defendant Prendergast also stated that JOANN should do an online shop-in-shop with Low Tech Toy, and that JOANN could put a banner on the Company's online home page that online shoppers could click to access Low Tech Toy's products.

107.    By this time, since the summer/fall of 2024, Defendants knew the Company was facing major inventory challenges that prevented JOANN from realizing the revenue projections

33

it needed to achieve to continue as a viable going concern.[32] Defendants also knew since the fall 2024 that the Company's liquidity had suffered too greatly to allow it to service its debt load while responsibly operating the business.[33] Defendants further knew that the agent on the FILO Facility imposed a $10 million reserve under JOANN's credit agreement in August 2024.

108.    Defendants knew and intended that Low Tech Toy would rely upon these above representations and that the representations provided Low Tech Toy assurance that if it shipped goods to JOANN on credit, then JOANN had the ability to pay and that JOANN would continue to business with Low Tech Toy for the next several years.

109.    By November and December 2024, JOANN began to miss payments on Low Tech Toy's invoices.

### 2.    Defendants' Representations to Plaintiffs Were False

110.    The representations described above concerning JOANN's ability to pay Plaintiffs for goods ordered on credit were false because Defendants failed to mention several factors that JOANN was facing during the Relevant Period that made it difficult for the Company to service even the restructured debt load resulting from the 2024 Bankruptcy.[34]

111.    For example, upon information and belief, JOANN experienced operational and financial issues immediately after emerging from the 2024 Bankruptcy. Defendants knew that the Company's financial report for the thirteen-week period ending August 3, 2024 showed that JOANN faced a net loss of $92 million and adjusted EBITDA of negative $43 million.[35]

---

[32]   *See* Prendergast Decl., at ¶ 62.

[33]   *Id*. at ¶ 69.

[34]   *See* Prendergast Decl., at ¶ 67.

[35]   *See In re JOANN INC.*, Case No. 25-10068 (Bankr. D. Del.), Omnibus Objection, Ex. A (JOANN Inc., Consolidated Financial Statements, Thirteen Weeks Ended August 3, 2024).

Case 25-51022-CTG   Doc 1-1   Filed 06/13/25   Page 36 of 70

112. Defendants also knew that JOANN was facing macroeconomic issues while attempting to implement its 2024 Restructuring Plan. Specifically, inflation and rising interest rates were plaguing the retail industry, which led to a sector-wide decline in retail sales in April 2024 and continued depressions in retail spending into summer of 2024.[36] Defendants also knew that JOANN was facing competitive pricing challenges in April 2024 when one of its key competitors announced lower prices on over 5,000 items in their arts, crafts, DIY, and home décor product categories.[37] These macroeconomic pressures across the retail sector made it difficult for JOANN to implement its 2024 Restructuring Plan and were applying downward pressure on margins.[38]

113. Defendants also knew that in attempting to effectuate its 2024 Restructuring Plan, JOANN was facing major inventory challenges that unsustainably depressed revenue against projections. JOANN was facing inventory shortages and poor sales by the summer and into the fall of 2024.[39] And Defendants knew these inventory and restocking challenges prevented JOANN from realizing the revenue projections it needed to achieve to continue as a viable going concern.[40] In the fall of 2024, when JOANN began restoring in-stock inventory levels, Defendants knew the Company's liquidity had suffered too greatly to allow it to service its debt load while responsibly operating the business.[41]

114. In August 2024, the agent on the FILO Facility imposed a $10 million reserve under the credit agreement. And in December 2024, the ABL Agent imposed reserves totaling $80 million, which decimated JOANN's liquidity.

---

[36] *See* Prendergast Decl., at ¶¶ 60-61.

[37] *Id*. at ¶ 61.

[38] *Id*.

[39] *See* Prendergast Decl., at ¶ 67.

[40] *See* Prendergast Decl., at ¶ 62.

[41] *Id*. at ¶ 69.

115.    On December 9, 2024, JOANN retained Centerview as investment banker to market the Company.

116.    On December 20, 2024, the agent on the ABL Facility took control of JOANN's cash, directing all cash accounts held at Bank of America, N.A. And on the same day, JOANN retained Kirkland & Ellis LLP as restructuring counsel.

117.    Defendants knew (or should have known) these facts – particularly Defendants Prendergast and Dwyer, as Directors of A&M, JOANN's advisor. To the extent that representations concerning JOANN's financial strength were true at some point during the Relevant Period, Defendants knew that JOANN's inventory levels over the summer and into the fall of 2024 had taken a negative toll on the Company's revenue and profitability, making it difficult for JOANN to service even the 2024 Bankruptcy restructured debt load, and that in August 2024, JOANN's liquidity was further restricted when JOANN was required to create a $10 million reserve under its credit agreement.  Once Defendants were aware of these facts, they continued to make representations to Plaintiffs that JOANN was financially strong and would pay for goods ordered on credit and failed to correct any of their earlier false statements. Defendants also knew that Plaintiffs did not know these facts, but Defendants failed to reveal the truth an did not correct their earlier false statements.

118.    Instead, Defendants concealed the truth and continued to recklessly, negligently and/or fraudulently misrepresent facts to Plaintiffs. As an example, and as set forth above, Defendants Dwyer and Prendergast made representations to Plaintiff Ormo on December 3, 2024 that JOANN was doing well and that a new CEO had been appointed and would be announced soon – these representations occurred just six days before JOANN retained Centerview to market the Company for sale.

119.    Defendants personally communicated with Plaintiffs to assure them that they would be paid and, at least Defendants Prendergast and Dwyer, instructed JOANN employees to deliver the same message to Plaintiffs and to continue to place orders on credit. Even in December 2024, when JOANN had retained Centerview to market and sell the Company, Defendants continued to make assurances to Plaintiffs and failed to instruct JOANN employees to stop ordering goods on credit.  These representations continued, in some instances, in to January 2025, shortly before JOANN filed its 2025 Bankruptcy. Defendants' reckless, negligent and/or fraudulent misrepresentations caused Plaintiffs losses of more than $40 million.

120.    Defendants Prendergast and Dwyer, as interim CEO and CFO, respectively, and as Directors of A&M, knew their representations to Plaintiffs that JOANN was financially sound and that Plaintiffs would be paid for goods they shipped on credit were false during the Relevant Period. To the extent any of the Defendants were not aware of the falsity of the representations they made to Plaintiffs, those Defendants recklessly made representations to Plaintiffs because they failed to properly verify that their representations to Plaintiffs concerning the Company's financial condition and prospects were true and accurate.

### 3.    Defendants Had Special Knowledge and Expertise

121.    Defendants possessed special knowledge and expertise concerning JOANN's ability to pay for goods ordered on credit, and that special knowledge and expertise was not readily available to Plaintiffs.

122.    From at least June and July 2024 through the Petition Date, Defendants Prendergast and Dwyer, respectively, were deeply involved in JOANN's management, operations, direction and financial and business planning. As such, Defendants Prendergast and Dwyer knew or should have known that JOANN would not be able to satisfy its obligations to Plaintiffs. Furthermore,

Defendants Prendergast and Dwyer are both Directors of A&M, JOANN's advisor in its current bankruptcy proceeding, who JOANN retained in February 2024 to provide interim management services, assist in cost-saving measures, among other services, and thus had to have been aware of JOANN's increasing debt and liquidity concerns. To that end, Defendants Prendergast and Dwyer were uniquely situated to and motivated to make assurances to Plaintiffs, albeit false, that JOANN had sufficient means to pay for the goods Plaintiffs provided on credit for the purpose of convincing Plaintiffs to extend credit and provide goods to JOANN so that it would have as much inventory as possible in its stores in order to achieve its sales goals and be profitable.

123.     As officers and/or top-level executives of JOANN, Defendants Bowers, DiTullio, Holody, Kennedy and Will were deeply involved in JOANN's customer relationships, merchandising and/or accounting, As such, these Defendants possessed special knowledge and expertise concerning the Company's inventory shortages, sales data, business relationships, projected revenue and financial performance and, thus, should have been aware of the Company's ability to pay for goods ordered on credit from Plaintiffs, and that special knowledge and expertise was not available to Plaintiffs.

124.     Further, Defendants Bowers, DiTullio, Holody, Kennedy and Will were aware that Defendants Prendergast and Dwyer, as Interim CEO and CFO, respectively, were concurrently serving as Directors of A&M and were aware that Defendants Prendergast and Dwyer knowingly made misrepresentations to Plaintiffs – and directed Defendants to make representations – concerning JOANN's ability to pay for goods shipped on credit for the purpose of inducing Plaintiffs to provide those goods for JOANN's benefit.  Defendants thus had special knowledge and expertise concerning the purpose and intent of Defendants' representations to Plaintiffs concerning JOANN's ability to pay for goods shipped on credit. That special knowledge and

expertise was not available to Plaintiffs. Alternatively, Defendants Bowers, DiTullio, Holody, Kennedy and Will, at the direction of Defendants Prendergast and Dwyer, made reckless representations concerning JOANN's ability to pay for goods provided on credit without confirming the accuracy of those representations identified herein.

125.    Upon information and belief, Defendants Prendergast and Dwyer instructed Defendants Bowers, DiTullio, Holody, Will, and Kennedy to make representations and assurances to Plaintiffs that JOANN was financially sound and was able to pay Plaintiffs for the goods provided to JOANN on credit for the purpose of inducing Plaintiffs to provide goods to the Company on credit.

126.    To the extent that any Defendant was not aware of the falsity of the representations he or she made to Plaintiffs, those Defendants recklessly made those representations because they did not conduct any due diligence to determine if any such representations concerning the Company's financial condition and prospects were true or accurate.

127.    Plaintiffs justifiably assumed that the Defendants possessed expertise and unique knowledge concerning JOANN's ability to pay for goods ordered on credit.

### 4.    Defendants Intended that Plaintiffs Would Rely on the Representations

128.    Each Defendant knew (or was willfully blind to the fact) that Plaintiffs were relying on Defendants' representations that JOANN had the ability to pay for goods ordered on credit following the 2024 Restructuring Plan because JOANN had cut its debt in half and had new-found liquidity through the exit facilities. Each Defendant knew that JOANN's new liquidity would provide the Plaintiffs assurances so that they would accept new purchase orders and ship goods to JOANN on credit. For example, as detailed above, the representations made to Plaintiffs that the Company was in the best financial position it had experienced in years, and the representations in

JOANN's Vendor Presentation, dated March 25, 2024, that explained the Company's debt reduction, exit facilities, and future prospects, were specifically targeted to, and provided to, vendors, including Plaintiffs, in an effort to persuade Plaintiffs to ship goods on credit. Defendants knew (or should have known) that these representations were made for the purpose of having Plaintiffs rely on those representations to induce Plaintiffs to ship goods to JOANN on credit.

**5.    Plaintiffs Justifiably Relied on Defendants' Representations**

129.    From March 25, 2024 through January 15, 2025, Plaintiffs justifiably relied to their detriment on Defendants' representations that JOANN was in the best financial shape it had been in for years and that it could pay Plaintiffs for the goods they provided to JOANN on credit.

130.    The location where acts of reliance by Plaintiffs occurred varied depending on where each Plaintiff was located. For example, Plaintiff Advantus acted on reliance in Florida; Plaintiff Fairfield acted in reliance in Connecticut; Plaintiff Gwen Studios and Springs Creative acted in reliance in South Carolina; Plaintiff Ormo acted in reliance in Ohio and Turkey; and Plaintiff Low Tech Toy acted in reliance in North Carolina.

131.    Plaintiffs justifiably relied to their detriment on misrepresentations and, in some instances, inaccurate financial information, provided by JOANN that later proved to be substantially inaccurate, in making decisions to extend credit to JOANN. Plaintiffs each justifiably relied on Defendants' representations, given (i) their longtime business relationships with JOANN; (ii) the fact that JOANN had wiped out over $500 million of its debt and was provided with exit facilities to drive free cash flow across the Company in the 2024 Restructuring Plan; and (iii) their past experience with JOANN during the 2024 Bankruptcy process, which resulted in JOANN paying each Plaintiff in full for past due amounts. For these reasons, Defendants' representations did not appear unreasonable on their face.

132.     Further, Defendants did not personally bring to the Plaintiffs attention that JOANN

had experienced operational and financial issues shortly after emerging from the 2024 Bankruptcy.

Nor did Defendants disclose that for the thirteen-week period ending August 3, 2024, JOANN had

faced a net loss of $92 million and adjusted EBITDA of negative $43 million, as detailed above.

Defendants also did not personally bring to Plaintiffs attention that by summer and into the fall of

2024, JOANN was facing inventory and restocking challenges and poor sales that would prevent

JOANN from realizing the revenue projections it needed to continue as a viable going concern.

Nor did Defendants disclose to Plaintiffs that by the fall of 2024, the Company's liquidity had

suffered too greatly to allow it to service its debt load while responsibly operating the business.

133.     Plaintiffs did not have access to the special knowledge and expertise possessed by

Defendants, as alleged more specifically above, and therefore had no ability to assess JOANN's

financial status. The facts were peculiarly within Defendants' knowledge, not available to

Plaintiffs, and could not have been discovered by Plaintiffs through the exercise of ordinary

intelligence.

134.     As trade vendors, whether Plaintiffs would be paid for the goods they shipped was

of paramount importance. Plaintiffs sell goods to be paid for those goods. In deciding whether to

ship goods to a company, Plaintiffs evaluate the risks involved in shipping those goods. Defendants

were aware that payment assurances were a means to secure Plaintiffs' business and goods on

credit. In fact, JOANN acknowledged in court filings that "absent an ability to demonstrate that

[JOANN has] the means available to operate in the ordinary course and procure goods and services

that are vital to ongoing business operations, [JOANN] understand[s] that…vendors and supplies

may refuse to do business with [JOANN]."[42] In court filings relating to the 2024 Bankruptcy,

---

[42]  Sekella Decl., at ¶ 60.

JOANN acknowledged that "[d]isruption to [JOANN's] timely receipt of necessary goods and services could negatively impact [JOANN's] operations and ability to meet their commitments in the ordinary course, which would harm their business," and that it was "imperative that [JOANN] maintain positive relationships with the providers of goods and services essential to their business operations."[43]

135.    Under these circumstances, Plaintiffs had no apparent reason to disbelieve Defendants' representations. Further, Plaintiffs did not have the ability to investigate the truthfulness of the representations, as any documents supporting Defendants' representations touting JOANN's financial strength, such as internal data sources and internal communications, were exclusively within JOANN's custody and control.

136.    Plaintiffs justifiably assumed that the Defendants possessed expertise and unique knowledge concerning JOANN's ability to pay for goods ordered on credit.

137.    In reliance on Defendants' misrepresentations, each Plaintiff provided goods and services to JOANN on credit during the Relevant Period and has suffered losses.

**D.    *At a Time When JOANN Was Behind on Payments to Plaintiffs, JOANN Strong Armed Plaintiffs to Pay JOANN for Margin Decline or to Renegotiate Terms at the Direction of Defendants Prendergast and Dwyer***

138.    Despite Defendants' numerous representations to Plaintiffs that JOANN was in the best financial shape it had been in for years, in or about September and October 2024, JOANN approached each Plaintiff with "Project Flywheel." Project Flywheel was a cost-savings program developed by Defendants Prendergast and Dwyer and their A&M colleagues for JOANN that involved JOANN asking each vendor to provide "margin support" to cut losses with JOANN's

---

[43]    *In re JOANN INC.*, No. 24-10418 (Bankr. D. Del.), Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business and (II) Granting Related Relief, Docket No. 5, ¶ 15, filed March 18, 2024.

vendors, using JOANN's prior sales of Plaintiffs' products as the basis for the amounts JOANN requested from each Plaintiff. Plaintiffs' business relationships with JOANN spanned four years to 40 years, and JOANN had never approached any Plaintiff with such a request in the past.

139.    In connection with Project Flywheel, JOANN provided Plaintiffs with "vendor packets," which were presentations prepared by A&M's Consumer & Retail Group, that purported to provide the financial backup for the amount of money JOANN was requesting from each Plaintiff.

### 1.    Concessions made by *Advantus*

140.    During the Relevant Period, Advantus made numerous concessions and agreements – to JOANN's benefit – to further its business partnership with JOANN. For example, Advantus, among other things, (i) extended payment terms after JOANN's 2024 Bankruptcy; (ii) reduced costs through multiple line reviews; and (iii) absorbed committed inventory that was cancelled by JOANN. But JOANN insisted on more.

141.    On September 20, 2024, Advantus and Defendants Will, Dwyer and Prendergast had a video conference meeting during which Defendant Dwyer explained that JOANN had assessed profitability and its profits and losses for all of its important vendors. Defendant Will said that JOANN was asking Advantus for $750,000 in "margin support," and that JOANN had done a detailed analysis by SKU to get to the $750,000, which would be provided to Advantus to outline the margin degradation.

142.    Also on September 20, 2024, Advantus received an email from JOANN summarizing its "Project Flywheel" (the Company's internal project name) ask of Advantus, which included an "all-in support ask" of $762,000. The email further stated "We continue to appreciate our partnership and look forward to the future ahead," and attached two documents that

Case 23-51022-CTG    Doc 1-1    Filed 06/13/25    Page 45 of 70

purported to back up the $762,000 request, including a "vendor packet" prepared by A&M and an excel spreadsheet with line item details of the purported margin degradation.

143.    On October 7, 2024, Advantus told Defendant Will that JOANN's documents backing up the margin support request were error-ridden. Advantus stated:

> "[t]he deck and information you provided includes multiple companies that are not part of Advantus. You assigned the dollar about of $762k and we can tie approximately $425k to Advantus. As we reviewed the AUC and Margin Dilution categories, it was apparent pricing from Advantus was not the issue and inactive sku's and markdown was a contributing component. The largest category was Margin Erosion and there was no backup provided in this area. The most important factor that Advantus contributes is our cost of goods and it is evident that we have not raised pricing and have even provided cost concessions.

144.    JOANN's margin support ask of Advantus was based on inaccurate data and incorporated "loss" JOANN experienced from companies other than Advantus.  It is unclear whether JOANN or A&M ever recalculated its erroneous original ask of $762,000 or requested a new "accurate" margin support of Advantus.

145.    On October 25 and 31, 2024, Advantus emailed Defendant Will concerning the Company's past due balance of over $800,000 and requested that JOANN provide its second quarter 2024 financial statements.

146.    In addition to the margin support request, JOANN continued to seek additional money from Advantus. On October 31, 2024, Defendant Bowers sent an email to Advantus stating that JOANN had recently completed a financial audit across fiscal year 2024 and 2025, and has determined that Advantus owes "damages" per the terms of JOANN and Advantus' agreement of $32,385, and that JOANN had incurred incremental damages of $34,022, for which the Company was seeking contribution. Defendant Bowers stated, "[t]he $32,385 will be taken as a credit in our system. Please respond by email to confirm your contribution on the $34,022 of incremental damages we have incurred."

147.    On November 19, 2024, per Advantus' request, JOANN provided Advantus with JOANN's second quarter 2024 financial information.

148.    Following negotiations on November 7 and 18, 2024 concerning JOANN's "Project Flywheel" request, Advantus felt compelled to reach a resolution with JOANN, and, on November 21, 2024, Advantus proposed to Defendants Will, Prendergast and Dwyer a resolution on the margin support request:

- Advantus previously offered $50,000 in margin support and we will increase this to $100,000. This will be paid on January 17th, as you have previously requested. Our account must be current to transfer the payment

- Our records indicate that Joann will have $1,665,688 due to Advantus by 11/29. We ask for this to be paid by 11/29 or earlier.

- We will start releasing held shipments once we confirm payment and will continue as Joann remains current on payment terms.

- Advantus to receive Q3 financials when released and available, prior to the payment on 1/17.

149.    On November 21, 2024, Defendant Will accepted Advantus' offer of $100,000 and agreed to make JOANN's account current with Advantus by December 6, 2024, but refused to provide JOANN's financial information. Defendant Will further stated, "We appreciate your partnership and look forward to driving mutual growth."

150.    On November 2, 2024, Defendant Dwyer told Advantus that JOANN would apply Advantus' $100,000 "margin support" payment to upcoming open accounts, and further stated: "We appreciate your partnership and look forward to driving mutual growth."

151.    On November 26, 2024, a JOANN buyer emailed Advantus stating that JOANN was current on its Advantus accounts and requested shipment. JOANN *was not* current on its accounts, and someone at JOANN must have instructed the buyer to request shipment from Advantus with the false knowledge that JOANN was current on its account. The purpose of this

email is clear: to try to induce or trick Advantus to ship to JOANN on the false notion that JOANN had paid Advantus its outstanding balance.

152.    On December 6, 2024, Advantus contacted Defendants Will, Dwyer, Bowers and Prendergast stating that JOANN was behind on payment and currently owed approximately $1.4 million to Advantus, stating, "we have made commitments based on the timeline of payment you provided to us."

153.    By December 9, 2024, Advantus contacted Defendants Bowers, Will, Dwyer and Prendergast requesting that JOANN pay the $440,000 owed to Advantus to "bring our accounts within terms, and then continue with ongoing payments to maintain our agreed upon terms."

154.    For several weeks, Defendants Will, Prendergast and Dwyer failed to respond to Advantus' attempts to collect payment from JOANN on December 6, 9, 11, 13, 17, 18 and 30, 2024.

155.    On December 16, 2024, a buyer at JOANN emailed Advantus, stating that "[w]e were advised yesterday that payments are current," and requested that Advantus ship product to JOANN. Once again, Defendants Will Prendergast and Dwyer knew the Company was not current on its Advantus account, and knew that JOANN had already retained Centerview to market and sell the company, but nonetheless sought to induce Advantus to ship product to JOANN and failed to inform JOANN employees to stop placing orders on credit with Advantus.

### 2.    Concessions made by *Fairfield*

156.    As part of Project Flywheel, JOANN requested that Fairfield provide JOANN with "margin support." On September 16 and 18, 2024, Fairfield sent an email to Defendants Dwyer, Bowers and Will requesting payment on past due invoices.

157.    On September 18, 2024, Fairfield and Defendants Will, Dwyer, Prendergast, along with additional A&M representatives, had a phone call to discuss the "margin dilution" that

JOANN experienced relating to Fairfield's product line for fiscal years 2023 and 2024. Defendants Prendergast and Will discussed JOANN's financial strength but then requested $344,000 from Fairfield to contribute to JOANN's margin dilution on Fairfield's product line. Following the phone call, Fairfield explained the call to Defendant Holody: "The ask is for Fairfield to fund a 334k margin gap to shore up the difference between 59% and 62% from the past? In a world where forecasts and orders are being cut, invoices aren't getting paid, and prices are going up after we rode through 18 months of below market costs to get Joann through their liquidity crisis, they come at us with this ask?"

158.    On September 18, 2024, Defendants Dwyer, Prendergast and Will reiterated the $344,000 "all in support ask" of Fairfield and stated, "[w]e continue to appreciate our partnership and look forward to the future ahead." Attached to the email was Fairfield's "vendor packet," prepared by A&M and an excel file purporting to provide support of the requested amount.

159.    On September 14, 20 and 26, 2024, the parties negotiated the margin dilution issue and JOANN's overdue account.

160.    In addition to the margin dilution request, and while JOANN was far behind on its payments to Fairfield, JOANN sought additional money from Fairfield. On November 5, 2024, Defendant Bowers sent an email to Fairfield, copying Defendants Prendergast and Dwyer, stating that JOANN had completed a thorough audit of Fairfield's account for fiscal years 2024 and 2025 YTD and determined that Fairfield owed $7,833 in damages and rebates to JOANN. Defendant Bowers further stated: "JOANN will include these amounts as a credit in our system."

161.    Ultimately, JOANN imposed on Fairfield a margin support amount of $65,000, which JOANN took without Fairfield's consent.

### 3.    Concessions made by *Gwen Studios*

162.    As part of Project Flywheel, JOANN requested that Gwen Studios agree to amended terms for the benefit of JOANN to provide "margin support." Gwen Studios felt that it had no choice but to agree to the amended terms if it wanted to maintain its business relationship with JOANN. Thus, on August 18, 2024, Gwen Studios and JOANN entered into an Agreement and Amendment to their Master Vendors Contract (the "Gwen Studios Amendment"). As part of the Gwen Studios Amendment, Gwen Studios agreed to a 90-day payment term, instead of a 30-day payment term. Gwen Studios also agreed to retroactively give JOANN a 3% payment term allowance on Christmas 2023 items, and thus agreed to pay JOANN $197,627 for the Christmas 2023 discount. JOANN deducted $28,930 from Gwen Studio's invoice in April 2024, and Gwen Studios was to pay the balance of the full amount, or $168,697, by a supplemental contract in September 2024.

163.    In addition to these concessions, and at JOANN's insistence, the Gwen Studios Amendment also required Gwen Studios to provide rebates to JOANN for the "JOANN FY25 Holiday Giftwrap Accessories" in the amount of $158,999. The rebates ranged from 1.5% to 5% depending on the amount of the order JOANN placed with Gwen Studios. The Gwen Studios Amendment also established a rebate for JOANN's total fiscal year 2026 business with Gwen Studios, with rebates ranging from 2.5% to 3.5%, depending on order dollar amounts ranging from $10 million to $20 million. Defendant Will signed the Gwen Studios Agreement on behalf of JOANN.

### 4.    Concessions made by *Ormo*

164.    On September 26, 2024, Ormo had a phone call with Defendants Prendergast, Dwyer, Will, along with other representatives at A&M. During that call, Defendants Prendergast, Dwyer and Will discussed JOANN's need for "margin support," and stated that the Company's

"all-in support ask" of Ormo was $842,000. On that same Day, Defendants Will, Prendergast and Dwyer sent an email to Ormo confirming JOANN's margin support ask from Ormo, and provided Ormo with a "vendor packet" prepared by A&M and an excel spreadsheet purporting to support JOANN's request. Defendant Will further stated "We continue to appreciate our partnership and look forward to the future ahead."

165. Plaintiff Ormo ultimately refused to provide JOANN with "margin support," because JOANN already had a 45% margin with Ormo.

### 5.    Concessions made by *Springs Creative*

166. On October 17, 2024, Springs Creative had a call with Defendants Prendergast, Dwyer and Will, as well as two other A&M representatives. During that call, Defendant Prendergast discussed JOANN's strong financial position and explained JOANN's "three prong strategy" for growth. JOANN further asked Springs Creative for an "all-in dilution support" ask of $353,000. The following day, Defendant Will confirmed JOANN's request of $353,000 and provided Springs Creative with a "vendor packet" prepared by A&M and an excel spreadsheet, which purportedly provided support for the dilution support ask.

167. From October 18 through October 21, 2024, Springs Creative and Defendants Will, Prendergast and Dwyer negotiated terms of the margin support request. And, on October 21, 2024, Springs Creative agreed to provide JOANN with a $250,000 margin support payment in exchange for a payment schedule for JOANN's outstanding invoices of $3.5 million (proposed by Defendant Dwyer). Also on October 21, 2024, Defendant Will stated '[w]e hope this is workable so we can get all of our minds pivoted to growth initiatives to drive our business!"

168. Ultimately, JOANN deducted Springs Creative's margin support from JOANN's outstanding invoices without Springs Creative's approval and without becoming current on overdue invoices, despite the parties agreement otherwise.

169.    In addition, on October 30, 2024, a divisional merchandise manager reached out to Springs Creative to push back shipment of a $1.64 million order placed by JOANN – essentially asking Springs Creative to "buy back" inventory. Springs Creative will now be forced to sell the inventory ordered by JOANN at significantly lower margins, if not at a loss.

## CAUSES OF ACTION

### COUNT I
### Common Law Fraud/Fraudulent Misrepresentation (Florida Law)
### (Plaintiff Advantus Against All Defendants)

170.    Plaintiffs restate and re-allege the allegations of each of the prior and following paragraphs as if fully set forth herein.

171.    This Count is asserted on behalf of Plaintiff Advantus against all Defendants for violations of Florida law.

172.    As more specifically alleged above, Defendants made, caused to be made, or recklessly made, false representations that were made as statements of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Advantus during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Advantus.

173.    Defendants' misrepresentations were material to Plaintiff Advantus's decision to ship goods to JOANN on credit.

174.    As more specifically alleged above, Defendants' representations were untrue and Defendants knew or reasonably should have known that these representations were false and misleading.

175.     As more specifically alleged above, Defendants made these misrepresentations with the intent and purpose of inducing Plaintiff Advantus to provide products to JOANN on credit, and Defendants knew (or were willfully blind to the fact) that Plaintiff would rely upon these misrepresentations.

176.     As more specifically alleged above, Plaintiff Advantus reasonably and justifiably relied on Defendants' misrepresentations and did not have reasonable means of knowing the truth.

177.     As more specifically alleged above, Plaintiff Advantus suffered losses of at least $6,487,708 as a result of its reliance on Defendants' misrepresentations.

## COUNT II
### Common Law Fraud/Fraudulent Misrepresentation (Connecticut Law)
### (Plaintiff Fairfield Against All Defendants)

178.     Plaintiffs restate and re-allege the allegations of each of the prior and following paragraphs as if fully set forth herein.

179.     This Count is asserted on behalf of Plaintiff Fairfield against all Defendants for violations of Connecticut law.

180.     As more specifically alleged above, Defendants made, caused to be made, or recklessly made, false representations that were made as statements of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Fairfield during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Fairfield.

181.     Defendants' misrepresentations were material to Plaintiff Fairfield's decision to ship goods to JOANN on credit.

182.    As more specifically alleged above, Defendants' representations were untrue and Defendants knew or reasonably should have known that these representations were false and misleading.

183.    As more specifically alleged above, Defendants made these misrepresentations with the intent and purpose of inducing Plaintiff Fairfield to provide products to JOANN on credit, and Defendants knew (or were willfully blind to the fact) that Plaintiff would rely upon these misrepresentations.

184.    As more specifically alleged above, Plaintiff Fairfield reasonably and justifiably relied on Defendants' misrepresentations and did not have reasonable means of knowing the truth.

185.    As more specifically alleged above, Plaintiff Fairfield suffered losses of at least $3,004,808 as a result of its reliance on Defendants' misrepresentations.

### COUNT III
### Common Law Fraud (Ohio Law)
### (Plaintiff Ormo Against Defendants Dwyer, Prendergast, Will and DiTullio)

186.    Plaintiffs restate and re-allege the allegations of each of the prior and following paragraphs as if fully set forth herein.

187.    This Count is asserted on behalf of Plaintiff Ormo against Defendants Dwyer, Prendergast, Will and DiTullio for violations of Ohio law.

188.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio made, caused to be made, or recklessly made, material misrepresentations of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Ormo during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Ormo.

189. As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio's misrepresentations were material to Plaintiff Ormo's decision to ship goods to JOANN on credit.

190. As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio knew that these representations were false and misleading or made with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred.

191. As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio knew (or were willfully blind to the fact) that Plaintiff would rely upon these misrepresentations and intended to mislead Plaintiff Ormo into relying upon these misrepresentations.

192. As more specifically alleged above, Plaintiff Ormo reasonably and justifiably relied on the misrepresentations and did not have reasonable means of knowing the truth.

193. As more specifically alleged above, Plaintiff Ormo suffered losses of at least $8,638,158 in actual damages, and at least $250,000 in incidental damages, as the proximate result of its reliance on Defendants Dwyer, Prendergast, Will and DiTullio's misrepresentations.

### **COUNT IV**
### **Common Law Fraud/Fraudulent Misrepresentation (South Carolina Law)**
### **(Plaintiff Gwen Studios Against all Defendants)**

194. Plaintiffs restate and re-allege the allegations of each of the prior and following paragraphs as if fully set forth herein.

195. This Count is asserted on behalf of Plaintiff Gwen Studios against all Defendants for violations of South Carolina Law.

196.    As more specifically alleged above, Defendants made, caused to be made, or recklessly made, material misrepresentations of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Gwen Studios during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Gwen Studios.

197.    As more specifically alleged above, Defendants' misrepresentations were material to Plaintiff Gwen Studios' respective decisions to ship goods to JOANN on credit.

198.    As more specifically alleged above, Defendants knew that these representations were false and misleading or recklessly disregarded the truth or falsity of these representations.

199.    As more specifically alleged above, Defendants knew (or were willfully blind to the fact) that each Plaintiff would rely upon these misrepresentations and intended Plaintiff Gwen Studios to rely upon these misrepresentations.

200.    As more specifically alleged above, Plaintiff Gwen Studios reasonably and justifiably relied on the misrepresentations and did not have reasonable means of knowing the truth.

201.    As more specifically alleged above, Plaintiff Gwen Studios suffered pecuniary losses of at least $5,392,558 in actual damages, and at least $3,269,165 in incidental damages, as the proximate result of their reliance on Defendants' misrepresentations.

### <u>COUNT V</u>
**Common Law Fraud/Fraudulent Misrepresentation (South Carolina Law)**
**(Plaintiff Springs Creative Against Defendants Dwyer, Prendergast, Will, Holody and DiTullio)**

202.    Plaintiffs restate and re-allege the allegations of each of the prior and following paragraphs as if fully set forth herein.

203.    This Count is asserted on behalf of Plaintiff Springs Creative against Defendants Dwyer, Prendergast, Will, Holody and DiTullio for violations of South Carolina Law.

204.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will, Holody and DiTullio made, caused to be made, or recklessly made, material misrepresentations of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Springs Creative during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Springs Creative.

205.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will, Holody and DiTullio's misrepresentations were material to Plaintiff Springs Creative's decisions to ship goods to JOANN on credit.

206.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will, Holody and DiTullio knew that these representations were false and misleading or recklessly disregarded the truth or falsity of these representations and failed to correct any of their earlier false statements.

207.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will, Holody and DiTullio knew (or were willfully blind to the fact) that each Plaintiff would rely upon these misrepresentations and intended Plaintiff Springs Creative to rely upon these misrepresentations.

*Tavia Galonski, Summit County Clerk of Courts*

208.    As more specifically alleged above, Plaintiff Springs Creative reasonably and justifiably relied on the misrepresentations and did not have reasonable means of knowing the truth.

209.    As more specifically alleged above, Plaintiff Springs Creative suffered pecuniary losses of at least $2,069,832 in actual damages, and at least $1,900,000 in incidental damages, as the proximate result of its reliance on Defendants Dwyer, Prendergast, Will, Holody and DiTullio's misrepresentations.

## COUNT VI
### Common Law Fraud/Fraudulent Misrepresentation (North Carolina Law)
### (Plaintiff Low Tech Toy Against Defendants Dwyer, Prendergast, Will and DiTullio)

210.    Plaintiffs restate and re-allege the allegations of each of the prior and following paragraphs as if fully set forth herein.

211.    This Count is asserted on behalf of Plaintiff Low Tech Toy against Defendants Dwyer, Prendergast, Will and DiTullio for violations of North Carolina law.

212.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio made, caused to be made, or recklessly made, material misrepresentations of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Low Tech Toy during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Low Tech Toy.

213.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio's misrepresentations were material to Low Tech Toy's decisions to ship goods to JOANN on credit.

214.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio's false representations were reasonably calculated to deceive Low Tech Toy and made with the intent to deceive or induce Plaintiff to provide goods to JOANN on credit.

215.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio knew that these representations were false and/or misleading or recklessly disregarded the truth or falsity of these representations.

216.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio knew (or were willfully blind to the fact) that Low Tech Toy would rely upon these misrepresentations and intended Plaintiff to rely upon these misrepresentations.

217.    As more specifically alleged above, Low Tech Toy was deceived by Defendants Dwyer, Prendergast, Will and DiTullio's false representations and reasonably and justifiably relied on the misrepresentations and did not have reasonable means of knowing the truth.

218.    As more specifically alleged above, Low Tech Toy suffered losses of at least $8,0370,595 in actual damages, and at least $250,000 in incidental damages, as a result of its reliance on Defendants Dwyer, Prendergast, Will and DiTullio's misrepresentations.

### <u>COUNT VII</u>
**Negligent Misrepresentation (Florida Law)**
**(Plaintiff Advantus Against Defendants Bowers, DiTullio, Holody, Kennedy and Will)**

219.    Plaintiffs restate and re-allege the allegations of each of the prior and following paragraphs as if fully set forth herein.

220.    This Count is asserted on behalf of Plaintiff Advantus against Defendants Bowers, DiTullio, Holody, Kennedy and Will for violations of Florida law.

221.     As more specifically alleged above, Defendants Bowers, DiTullio, Holody, Kennedy and Will made, caused to be made, or recklessly made, misrepresentations of material fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Advantus during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Advantus.

222.     Defendants' misrepresentations were material to Plaintiff Advantus's decisions to ship goods to JOANN on credit.

223.     As more specifically alleged above, at the direction of Defendants Prendergast and Dwyer, Defendants Bowers, DiTullio, Holody, Kennedy and Will made these misrepresentations of material fact, which he or she believed to be true, but which was, in fact, false.

224.     As more specifically alleged above, Defendants Bowers, DiTullio, Holody, Kennedy and Will were negligent in making these representations to Plaintiff Advantus because he or she should have known, or should have conducted due diligence to determine that, the representations were false and untrue.

225.     As more specifically alleged above, Defendants Bowers, DiTullio, Holody, Kennedy and Will made these misrepresentations with the intent and purpose of inducing Plaintiff Advantus to rely on the misrepresentations and provide products to JOANN on credit.

226.     As more specifically alleged above, Plaintiff Advantus reasonably and justifiably relied on Defendants' misrepresentations and did not have reasonable means of knowing the truth.

CV-2025-05-2241

227.    As more specifically alleged above, Plaintiff Advantus suffered damages of at least $6,487,708 as a result of its reliance on Defendants' misrepresentations.

## COUNT VIII
### Negligent Misrepresentation/Innocent Misrepresentation (Connecticut Law)
### (Plaintiff Fairfield Against all Defendants)

228.    Plaintiffs restate and reallege the allegations of each of the prior and following paragraphs as if fully set forth herein.

229.    This Count is asserted on behalf of Plaintiff Fairfield against all Defendants for violations of Connecticut Law.

230.    As more specifically alleged above, Defendants made, caused to be made, or recklessly made, material misrepresentations of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Fairfield during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Fairfield.

231.    As more specifically alleged above, Defendants' misrepresentations were material to Plaintiff Fairfield's decisions to ship goods to JOANN on credit.

232.    As more specifically alleged above, Defendants knew that these representations were false and misleading or recklessly disregarded the truth or falsity of these representations.

233.    As more specifically alleged above, Defendants knew (or were willfully blind to the fact) that Plaintiff would rely upon – and intended Plaintiff Fairfield to rely upon – these misrepresentations for the purpose of inducing Fairfield to provide products to JOANN on credit.

234.     As more specifically alleged above, Plaintiff Fairfield reasonably and justifiably relied on Defendants' misrepresentations and did not have reasonable means of knowing the truth.

235.     As more specifically alleged above, Plaintiff Fairfield suffered losses of at least $3,004,808 as a result of its reliance on Defendants' misrepresentations.

## **COUNT IX**
## **Negligent Misrepresentation (Ohio Law)**
## **(Plaintiff Ormo Against Defendants Dwyer, Prendergast, Will and DiTullio)**

236.     Plaintiffs restate and reallege the allegations of each of the prior and following paragraphs as if fully set forth herein.

237.     This Count is asserted on behalf of Plaintiff Ormo against Defendants Dwyer, Prendergast, Will and DiTullio for violations of Ohio law.

238.     As more specifically alleged above, in the course of their business relationship with Plaintiff Ormo, Defendants Dwyer, Prendergast, Will and DiTullio made, caused to be made, or recklessly made, material misrepresentations of fact and supplied false information for the guidance of Plaintiff, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Ormo during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Ormo.

239.     As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio made, recklessly made, or caused to be made, material misrepresentations of fact or false information for the guidance of Plaintiff Ormo in his business transactions with JOANN.

60

240.     Defendants Dwyer, Prendergast, Will and DiTullio failed to exercise reasonable care or competence in obtaining or communicating the information to Plaintiff Ormo. As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio reasonably should have known that these misrepresentations were false and misleading and Defendants failed to exercise reasonable care to ascertain the truth of the statements.

241.     As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio possessed unique knowledge and expertise concerning JOANN's ability to pay for goods ordered on credit, and that special knowledge and expertise was not readily available to Plaintiff. Plaintiff Ormo justifiably assumed that Defendants Dwyer, Prendergast, Will and DiTullio possessed expertise and unique knowledge concerning JOANN's ability to pay for goods ordered on credit. As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio had a previous and continuing relationship with Plaintiff Ormo.

242.     As more specifically alleged above, Plaintiff Ormo reasonably relied on the misrepresentations and did not have reasonable means of knowing the truth.

243.     As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio knew (or were willfully blind to the fact) that Plaintiff Ormo would rely upon these misrepresentations and intended Plaintiff to rely upon these misrepresentations.

244.     As more specifically alleged above, Plaintiff Ormo suffered losses of at least $8,638,158 in actual damages, and at least $250,000 in incidental damages, as a result of its justifiable reliance on Defendants Dwyer, Prendergast, Will and DiTullio's misrepresentations and false information.

## COUNT X
### Negligent Misrepresentation (South Carolina Law)
### (Plaintiff Gwen Studios Against all Defendants)

245.    Plaintiff Gwen Studios restate and reallege the allegations of each of the prior and following paragraphs as if fully set forth herein.

246.    This Count is asserted on behalf of Plaintiff Gwen Studios against all Defendants for violations of South Carolina Law.

247.    As more specifically alleged above, Defendants made, caused to be made, or recklessly made, material misrepresentations of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Gwen Studios during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Gwen Studios.

248.    Defendants made these misrepresentations to Plaintiff Gwen Studios to further JOANN's pecuniary interest of obtaining goods from Plaintiff Gwen Studios on credit.

249.    Defendants had a duty to disclose material facts to Plaintiff Gwen Studios because Defendants had superior knowledge and expertise to determine if JOANN could and would pay Plaintiff Gwen Studios for goods shipped on credit, the facts were peculiarly within Defendants' knowledge, not available to Plaintiff Gwen Studios, and could not have been discovered by Plaintiff Gwen Studios through the exercise of ordinary intelligence, and Defendants knew Plaintiff Gwen Studios would be acting on the basis of the false representations of fact.

250.    Defendants breached that duty by failing to exercise due care in making, or recklessly making, the misrepresentations to Plaintiff Gwen Studios.

251.    As more specifically alleged above, Plaintiff Gwen Studios justifiably and reasonably relied on Defendants' misrepresentations and did not have reasonable means of knowing the truth.

252.    As more specifically alleged above, Plaintiff Gwen Studios suffered pecuniary losses of at least $5,392,558 in actual damages, and at least $3,269,165 in incidental damages, as the proximate result of its reliance on Defendants' misrepresentations.

### COUNT XI
**Negligent Misrepresentation (South Carolina Law)**
**(Plaintiff Springs Creative Against Defendants Dwyer,**
**Prendergast, Will, Holody and DiTullio)**

253.    Plaintiff Springs Creative restates and realleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

254.    This Count is asserted on behalf of Plaintiff Springs Creative against Defendants Dwyer, Prendergast, Will, Holody and DiTullio for violations of South Carolina Law.

255.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will, Holody and DiTullio made, caused to be made, or recklessly made, material misrepresentations of fact, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Plaintiff Springs Creative during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Springs Creative.

256.    Defendants made these misrepresentations to Plaintiff Springs Creative to further JOANN's pecuniary interest of obtaining goods from Plaintiff Springs Creative on credit.

257.    Defendants Dwyer, Prendergast, Will, Holody and DiTullio had a duty to disclose material facts to Plaintiff Springs Creative because Defendants Dwyer, Prendergast, Will, Holody and DiTullio had superior knowledge and expertise to determine if JOANN could and would pay Plaintiff Springs Creative for goods shipped on credit, the facts were peculiarly within Defendants Dwyer, Prendergast, Will, Holody and DiTullio's knowledge, not available to Plaintiff Springs Creative, and could not have been discovered by Plaintiffs Springs Creative through the exercise of ordinary intelligence, and Defendants Dwyer, Prendergast, Will, Holody and DiTullio knew Plaintiff Springs Creative would be acting on the basis of the false representations of fact.

258.    Defendants Dwyer, Prendergast, Will, Holody and DiTullio breached that duty by failing to exercise due care in making, or recklessly making, the misrepresentations to Plaintiff Springs Creative.

259.    As more specifically alleged above, Plaintiff Springs Creative justifiably and reasonably relied on Defendants Dwyer, Prendergast, Will, Holody and DiTullio's misrepresentations and did not have reasonable means of knowing the truth.

260.    As more specifically alleged above, Plaintiff Springs Creative suffered pecuniary losses of at least $2,243,406 in actual damages, and at least $1,900,000 in incidental damages, as the proximate result of its reliance on Defendants Dwyer, Prendergast, Will, Holody and DiTullio's misrepresentations.

### COUNT XII
**Negligent Misrepresentation (North Carolina Law)**
**(Plaintiff Low Tech Toy Against Defendants Dwyer, Prendergast, Will and DiTullio)**

261.    Plaintiffs restate and reallege the allegations of each of the prior and following paragraphs as if fully set forth herein.

262.    This Count is asserted on behalf of Plaintiff Low Tech Toy against Defendants Dwyer, Prendergast, Will and DiTullio for violations of North Carolina law.

263.    As more specifically alleged above, Defendants Dwyer, Prendergast, Will and DiTullio made, caused to be made, or recklessly made, material misrepresentations of fact or supplied false information, including:

- JOANN had the ability to pay for goods ordered on credit because the Company was in the best financial position it had been in for years;

- JOANN had the ability to pay and would pay for the goods it ordered on credit from Low Tech Toy during the period from March 25, 2024 through January 15, 2025;

- JOANN would have the ability to pay for goods shipped on credit when the invoice came due; and

- JOANN had a positive outlook and would continue its business relationship with Plaintiff Low Tech Toy.

264.    Defendants Dwyer, Prendergast, Will and DiTullio failed to exercise reasonable care or competence in making these misrepresentations to Plaintiff.

265.    Defendants Dwyer, Prendergast and Will had a duty of reasonable care to disclose material facts to Low Tech Toy because Defendants Dwyer, Prendergast, Will and DiTullio and Will had superior knowledge and expertise to determine if JOANN would or could pay Plaintiff for goods shipped on credit, the facts were peculiarly within Defendant Dwyer, Prendergast, Will and DiTullios's knowledge, not available to Plaintiff, and could not have been discovered by Plaintiff Low Tech Toy through the exercise of ordinary intelligence, and Defendants Dwyer, Prendergast, Will and DiTullio knew Low Tech Toy would be acting on the basis of the false representations of fact or the information prepared without reasonable care.

266.    Defendants Dwyer, Prendergast, Will and DiTullio breached that duty of reasonable care by making, or recklessly making, the misrepresentations, or supplying false information, to Low Tech Toy.

Tavia Galonski, Summit County Clerk of Courts

267.    As more specifically alleged above, Low Tech Toy justifiably and reasonably relied on Defendants Dwyer, Prendergast, Will and DiTullio's misrepresentations and false information and did not have reasonable means of knowing the truth.

268.    As more specifically alleged above, Low Tech Toy reasonably and justifiably relied on Defendants Dwyer, Prendergast, Will and DiTullio's misrepresentations and information prepared without reasonable care to its detriment and suffered losses of at least $8,037,595 in actual damages, and at least $250,000 in incidental damages, as a result.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, by reason of the foregoing, Plaintiffs respectfully request that the Court enter judgment against Defendants and in favor of plaintiffs as follows:

a)  On Count I, entry of a judgment for Plaintiff Advantus against all Defendants by this Court in an amount to be determined at trial, but in an amount of at least $6,487,708, plus pre- and post-judgment interest;

b)  On Count II, entry of a judgment for Plaintiff Fairfield against all Defendants by this Court in an amount to be determined at trial, but in an amount of at least $3,004,808, plus pre- and post-judgment interest;

c)  On Count III, entry of a judgment for Plaintiff Ormo against Defendants Dwyer, Prendergast, Will and DiTullio by this Court in an amount to be determined at trial, but in an amount of at least $8,638,158 in actual damages, plus at least $250,000 in incidental and/or consequential damages, as well as pre- and post-judgment interest;

d)  On Count IV, entry of a judgment for Plaintiff Gwen Studios against all Defendants by this Court in an amount to be determined at trial, but in an amount of at least $5,392,558 in actual damages, plus at least $3,269,165 in incidental and/or consequential damages, as well as pre- and post-judgment interest;

e)  On Count V, entry of a judgment for Plaintiff Springs Creative against Defendants Prendergast, Dwyer, Will, Holody and DiTullio by this Court in an amount to be determined at trial, but in an amount of at least $2,069,832 in actual damages, plus at least $1,900,000 in incidental and/or consequential damages, as well as pre- and post-judgment interest;

f)  On Count VI, entry of a judgment for Plaintiff Low Tech Toy against Defendants Prendergast, Dwyer, Will and Ditullio by this Court in an amount to be determined at trial, but in an amount of at least $8,037,595 in actual damages, plus at least $250,000 in incidental and/or consequential damages, as well as pre- and post-judgment interest;

g)  On Count VII, entry of a judgment for Plaintiff Advantus against Defendants Bowers, DiTullio, Holody, Kennedy and Will by this Court in an amount to be determined at trial, but in an amount of at least $6,487,708, plus pre- and post-judgment interest;

h)  On Count VIII, entry of a judgment for Plaintiff Fairfield against all Defendants by this Court in an amount to be determined at trial, but in an amount of at least $3,004,808, plus pre- and post-judgment interest;

i)  On Count IX, entry of a judgment for Plaintiff Ormo against Defendants Prendergast, Dwyer, Will and DiTullio by this Court in an amount to be determined at trial, but in an amount of at least $8,638,158 in actual damages, plus at least $250,000 in incidental and/or consequential damages, as well as pre- and post-judgment interest;

j)  On Count X, entry of a judgment for Plaintiff Gwen Studios against all Defendants, by this Court in an amount to be determined at trial, but in an amount of at least $5,392,558 in actual damages, plus at least $3,269,165 in incidental and/or consequential damages, as well as pre- and post-judgment interest;

k)  On Count XI, entry of a judgment for Plaintiff Springs Creative against Defendants Prendergast, Dwyer, Will, Holody and DiTullio by this Court in an amount to be determined at trial, but in an amount of at least $2,069,832 in actual damages, plus at least $1,900,000 in incidental and/or consequential damages, as well as pre- and post-judgment interest;

l)  On Count XII, entry of a judgment for Plaintiff Low Tech Toy against Defendants Prendergast, Dwyer, Will and DiTullio by this Court in an amount to be determined at trial, but in an amount of at least $8,037,595 in actual damages, plus at least $250,000 in incidental and/or consequential damages, as well as pre- and post-judgment interest;

m) Awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action;

n)  awarding Plaintiffs post-judgment interest at the maximum rate permitted by law; and

o)  awarding Plaintiffs such other and further relief in their favor as this Court deems just and proper.

Dated: May 15, 2025

**BRENNAN, MANNA & DIAMOND**

*/s/ Hilary F. DeSaussure*

Victoria L. Ferrise (0085012)
Jack W. Hinneberg (0093000)
Hilary F. DeSaussure (0098989)
75 East Market Street, Akron, Ohio 44308
Tel: 330.374.5184
Email: vlferrise@bmdllc.com
            jwhinneberg@bmdllc.com
            hfdesaussure@bmdllc.com

**GRANT & EISENHOFER P.A.**

*/s/ Meagan Farmer*

Gordon Z. Novod (application for admission *pro hac vice* to be filed)
Meagan Farmer (application for admission *pro hac vice* to be filed)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com
            mfarmer@gelaw.com

*Counsel for Plaintiffs*

## INSTRUCTIONS FOR SERVICE

TO THE CLERK OF COURTS:

     Please issue the Summons and Complaint herein upon the Defendant by Certified Mail sent to the Defendants at the addresses listed in the caption of this Complaint.

                           */s/ Hilary F. DeSaussure*

                           Hilary F. DeSaussure (0098989)

                           *Counsel for Plaintiffs*